## Commonwealth *v.* Strantz, Appellant.

Argued September 27, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

J. *Mettler Pensyl* and *Russell S. Machmer,* for appellant.

*Robert M. Fortney,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, November 12, 1937:
This is an appeal from the sentence of death imposed upon the defendant, Walter Strantz, after he was convicted of murder in the first degree upon an indictment charging him with the malicious killing of Earl E. Rowe.

At 4 p. m. on April 9, 1937, the appellant, in company with one Joe Yurcavage, bought a box of 38 caliber bullets in Mount Carmel and gave some of them to Yurcavage. Later in the afternoon they went to the home in Shamokin where Yurcavage's estranged wife was employed, and there at 7 p. m. Yurcavage shot and fatally wounded her. The shooting was without any provocation. Mrs. Yurcavage in her ante-mortem statement, declared that just before she was shot by her husband, Strantz said to him: "Do not bother her, you have a good wife." However, after this shooting the appellant remained in Yurcavage's company, and for several hours thereafter, as hereinafter recorded, they engaged in a

joint campaign of robbery, murder, attempted murder, and general deviltry. At the close of their evening's felonious enterprise there were the following additions to the already ample chapters of their criminal careers: two persons, including Mrs. Yurcavage, had been murdered; two others had been shot in the abdomen; six persons had loaded revolvers either pressed to their bodies or pointed at them within a distance of one or two feet; four men had been robbed; several people had been shot at; State Police and other officers had been resisted and one of the State Police officers had been shot through the hat.

After the murder of Mrs. Yurcavage, their chronicle of crimes is as follows: They got into a taxicab and directed the driver to take them to Mount Carmel. En route, Yurcavage demanded that Sands, the taxi driver, turn the car over to him. Upon Sands's refusal to do so, Yurcavage pointed a revolver at him and made him move over from the driver's seat. Yurcavage told appellant to keep the driver covered and Yurcavage got out of the car to enter the driver's seat from the other side. Appellant held Sands by his overcoat collar and pointed a gun at him, but Sands slipped out of the coat and rolled out to the road. Two shots were fired from the car and it then started away in the direction of Kulpmont. About 8:30 p.m. this car collided with the car owned by one McElwee, which was parked on the highway. When the car was stopped, Yurcavage and appellant started to walk away. McElwee followed and thereupon Yurcavage turned and pointed a gun at him and said, "Stop or I will kill you," and *appellant said, "Let him have it." Appellant also "put a gun on" McElwee and said, "Let's give it to him."* No further violence was done to McElwee. The two men then proceeded toward Mount Carmel. Officer Tassyn, who was looking for these men, testified that *"both men pulled guns on him."*

At 9 p. m. both men entered the hotel of Londo Avelino in Kulpmont. Yurcavage ordered beer and each man drank two glasses of this beverage. Yurcavage also secured a sandwich which he divided with appellant. Yurcavage asked Avelino to take him and the appellant to Mount Carmel. When Avelino refused, Yurcavage said: If you don't take us, "I'm going to have it in for you." Avelino then made a request in the Italian language to his wife to go upstairs and get his gun, while he went out to the garage to get his car. When he was out, Mrs. Avelino heard *Strantz say to Yurcavage: "We will knock him off on our way down."* Both Avelino and his wife went to Mount Carmel in Avelino's car with Strantz and Yurcavage. Mrs. Avelino sat half turned around in the front seat so that she could observe the two passengers and she had her hand on her gun (apparently concealed). Strantz kept his hand in his pocket during the journey. A little later the two unwelcome guests left the car after they had found that "Hughesy is closed."

About 10:15 p. m. both men entered the hotel of Earl E. Rowe. They ordered beer and both were served by Rowe and given change. About a minute later, without saying anything, Yurcavage shot Rowe. The latter staggered into the parlor and said to his wife: "They got me." He then became unconscious and died shortly afterwards. After shooting Rowe, Yurcavage, covering the bystanders with his gun, retreated out of the room. Strantz also left the place immediately.

About 10:30 p. m. Yurcavage entered the kitchen of the home of Peter Profit, a man with one leg, in Mount Carmel, and shot him in the stomach. Just before he shot him he said: "I am going to give it to you." He then shot Peter's son Walter in the stomach. These wounds caused grievous and dangerous injuries. Strantz was not in the Profit home but *he and Yurcavage were seen together* three or four minutes after

the shooting, walking in a direction away from the Profit home.

Between 10:45 and 11 p. m. both appellant and Yurcavage walked into Bach's hotel. Appellant asked: "How are things going?" and Bach answered: "Not so hot." *Then appellant pulled the gun from his right-hand pocket and said, "This is a stick up; I am not kidding you either."* Yurcavage then held up another person who was present. Strantz went behind the bar and Yurcavage held a gun against Bach and told him it was money they wanted. Bach gave him all the money in his pocketbook, which was $32. At the same time *Strantz was with his gun covering the bartender at the cash register.* After Bach gave Yurcavage all the money he had, Yurcavage said: "Where are the slot machines?" Bach replied, "There are no slot machines in the place, there is a nickel victorola." Yurcavage then started to rifle the cash container of the victorola. Meantime *Strantz kept both Bach and the bartender covered with a gun.* Bach said: "There was one shot fired in the hotel but I couldn't learn which one of the two men fired it." *Strantz came into the hotel first,* followed by Yurcavage.

About 11 p. m. these two men entered the barroom of Walter Pincoskie. Yurcavage ordered "two beers." Pincoskie filled one glass and as he reached for another glass, *Strantz came behind the bar with a gun and said, "Stand there,"* and *"Open the cash register."* He commanded a second time that the cash register be opened. *He pointed a gun at Pincoskie* who was only two and one-half feet away from him. Pincoskie opened the register and *Strantz took out all the money there was there,* amounting to three or four dollars. *Strantz said, "Where are your bills?"* and Pincoskie replied: "I don't have any bills." Strantz then said, "Get around," and then Pincoskie pulled out a pocketbook of bills and gave Strantz *"pretty near $200."* Both men then left the place together.

State policeman Edwards told of the endeavor made a few hours later to apprehend Yurcavage and Strantz in a house in Mount Carmel Township. He commanded both men to come out, saying that the house had been surrounded by police. He testified: "They didn't come out but continued to shoot. One shot came through the wall and hit me on the hat. After fighting for sometime I called and asked if they would give up and someone said, 'Yes.' I stepped out in the middle of the room and a shot came through the door." The officer then threw a gas bomb. He said further: "After the gas had been thrown in we proceeded to the kitchen and shot through the ceiling and shot Strantz. After hearing groans we proceeded to the second floor and waited for someone to come out. We waited for the gas to clear up and then on calling and asking if they would give up, someone said, 'Yes.' . . . We kicked the door open and ordered Strantz to slide out, which he did." The officers then entered the room and found Yurcavage "slumped over the bed. He had been shot through the head. We found a gun laying at his finger tips." The gun contained three empty and two loaded shells.

The Chief of Police of Mount Carmel testified that he got a young fellow to search the pockets of Strantz after he was arrested and he pulled out nine 38 caliber bullets from his vest pocket. He also testified that about 9:30 a. m., several hours after Strantz was arrested, he found in the house where Strantz and Yurcavage had barricaded themselves, a 38 caliber gun. This was offered in evidence. The revolver contained four 38 caliber bullets.

To furnish the jury with data which they might use in deliberating as to the appropriate penalty should they adjudge Strantz guilty of murder in the first degree, the court permitted the introduction of certain records from the office of the Clerk of the Courts of Northumberland County, which showed that in 1925 Strantz had pleaded guilty to a charge of assault and

battery and making threats, for which he was fined $50 and sentenced to undergo imprisonment for three months, and that in 1932 he pleaded guilty to a charge of aggravated assault and battery with intent to kill. For this he was sentenced to a fine of $200 and to undergo imprisonment for not more than three years and not less than one and a half years. The record showed further that in 1935, Strantz and Yurcavage both pleaded guilty to a charge of burglary and were sentenced to pay the costs and to undergo imprisonment for not more than four years and not less than two years; that at the same sessions they both pleaded guilty to a charge of burglary and were sentenced to imprisonment for not more than four years and not less than two years, sentence of imprisonment to run concurrently with the previous sentence; that in 1937 appellant was sentenced for aggravated assault and battery with intent to kill; that in the same year he was sentenced for the theft of an automobile and for assault and battery with intent to kill, and sentenced also for carrying concealed weapons and a little later for pointing firearms and about the same time for aggravated assault and battery.

In support of this appeal from a conviction of murder and the death penalty, there are twenty-seven assignments of error but the basis of the appeal is set forth in appellant's statement of questions involved, to wit: "May first degree murder conviction be sustained, where defendant was present when victim was killed by another, the defendant doing no overt act, saying no word, giving no sign of aid or encouragement in connection therewith, and without prearrangement, although defendant committed other crimes, in company with assailant, on same night, before and after the killing?"

In its essence the charge against the appellant was that he and Yurcavage entered into a conspiracy to rob and murder and that, in furtherance of that conspiracy, they, acting in concert, murdered the victim named in the indictment. In his charge to the jury, the trial judge

did not present the issue with this explicitness but that was the charge's tenor and purport. The trial judge correctly said: "Where two join in the commission of an unjustified assault, which results fatally, both are guilty regardless of which one inflicts the mortal wound." Also, "Where two combine to commit a felony or make an assault, and in carrying out the common purpose another is killed, the one who enters into the combination but does not personally commit the wrongful act is equally responsible for the homicide with the one who deliberately and directly causes it. Was Strantz acting in concert with Yurcavage?"

If one aids and abets in the commission of a crime, he is guilty as a principal. One is an aider and abettor in the commission of any crime, i. e., he has "joined in its commission," if he was an active partner in the intent which was the crime's basic element. Chief Justice GIBSON in *Rogers v. Hall,* 4 Watts 359, said: "The least degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all." No principle of law is more firmly established than that when two or more persons conspire or combine with one another to commit any unlawful act, each is criminally responsible for the acts of his associate or confederate committed in furtherance of the common design. In contemplation of law the act of one is the act of all. See *Collins v. Com.,* 3 S. & R. 220; *Com. v. Brown,* 58 Pa. Super. Ct. 300; and *Com. v. Snyder,* 40 Pa. Super. Ct. 485.

That Yurcavage and this appellant on the afternoon of April 9, 1937, became partners in a criminal purpose and that this purpose was robbery and murder and that the murder of Rowe was an incident in the carrying out of that conspiracy is so clear from the Commonwealth's proof as to exclude to a moral certainty every hypothesis but that of appellant's guilt of the imputed offense. It was the appellant who at 4 p. m. bought the bullets with which two lives were a few hours later deliberately

blotted out. He was present at the murder of Mrs. Yur-
cavage, and while just before it he uttered some words
which, if uttered with sincerity, could be construed as
expressive of momentary compassion, he did *not* then
and there abandon the company of the murderer but re-
mained with him, aiding and abetting and coöperating
with him in the commission of other grave felonies. At
9 p. m. he and Yurcavage, with loaded and pointed pis-
tols, commandeered and stole an automobile, and he
made a sinister threat against its owner. At 10 : 15 he
was with Yurcavage when the latter killed Rowe. It is
an irresistible inference that these two men went into
Rowe's place of business to commit a robbery, similar
to the other robberies committed on the same evening
and in similar places, and that both fled with this *pri-
mary* purpose unaccomplished after they, in their ex-
cess of felonious zeal, had committed murder. Twenty
minutes later, Strantz was in Yurcavage's company as
both fled from the direction of a dwelling house where
Yurcavage had just shot two inoffensive citizens in the
abdomen. Within thirty minutes thereafter, *both*
Strantz and Yurcavage were with loaded revolvers, one
of which was discharged, holding up three men in one
hotel, and robbing two of them of their money, and were
holding up and robbing a fourth man in another hotel,
these three robberies yielding the felons at least two
hundred and thirty-five dollars.

If this evidence does not conclusively prove a criminal
conspiracy between Yurcavage and Strantz and that
Rowe fell an innocent victim of this conspiracy, then all
human evidence has lost its potency. In their paper
book appellant's counsel ask: "Are these facts sur-
rounding the shooting of Rowe, sufficient to sustain the
conviction on the theory that the defendant aided, abet-
ted and assisted Yurcavage in the commission of the
crime?" and then they say: "The authorities in the
State of Pennsylvania are of very little help in deter-

mining this question. No case has been found in Pennsylvania where the facts are similar."

The principles of law and logic here controlling are so clear that the Commonwealth's case needs no strengthening from factual precedents. However, if any are needed, the case of *Campbell v. Commonwealth*, 84 Pa. 187 (one of the "Molly Maguire" cases), may be cited. In that case it was conceded that the defendant charged with the murder of one John P. Jones was not present when the murder was committed, but this Court nevertheless held that the defendant was equally amenable to the charge of murder "whether he was present and actively participating in the commission of it, or was only present, encouraging and sustaining those who did commit it, or whether, being absent himself, he procured others to do the deed." See also *Hester v. Com.*, 85 Pa. 139, at p. 156, where it was held that certain evidence was properly admissible where "its purpose was to explain the relations existing between the conspirators, the reason, motive and opportunity for their combined action, and *the nature of the tie that bound them together* [italics supplied]."*

Appellant's conviction is *equally* sustainable on the theory that Rowe was killed by Yurcavage while the latter and Strantz were engaged in the attempt to perpetrate a robbery of Rowe's place of business *and* on the theory that both of them planned to commit together robbery *and* murder on the evening in question and that Rowe was done to death by an act which was a part of the concert of felonious action resulting from that plan. Concert of design does not necessarily involve participation in every detail of execution. (See *Com. v. Mur-*

---

* One of the men, Lewis Payne, hanged for the murder of Abraham Lincoln was adjudged by inference guilty of that murder as a co-conspirator with Booth, largely because on the same evening President Lincoln was shot, he, Payne, a close associate of Booth's, made a murderous assault on Secretary of State Seward at the latter's residence.

*rano,* 276 Pa. 239, 120 A. 106, and *Weston v. Com.,* 111 Pa. 251, 2 A. 191.)

In the light of the record facts, appellant's statement of the questions involved presents in its kernel an example of "petitio principii" or a taking for granted that which is to be proved. The very "other crimes" referred to and which the appellant committed with Yurcavage "on the same night both before and after the killing" of Rowe constitute facts from which the jury were justified in inferring that there *had been* that evening a criminal "pre-arrangement" between the appellant and Yurcavage to rob and murder, and that the killing of Rowe was one of its evil outgrowths. To assert in the statement of "questions involved" that all these two lawless characters did was done "without pre-arrangement" simply "begs the question." The heart of every conspiracy is a common understanding, no matter how it comes into being. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. In *Com. v. Jermyn,* 101 Pa. Super. Ct. 455, 465, the Superior Court, speaking through Judge GAWTHROP, aptly said: "The joint assent of minds required to sustain a charge of conspiracy may be inferred from facts which establish . . . that the conspiracy had been formed."

Our conclusion is that the evidence produced by the Commonwealth to prove that Rowe was killed as a result of a partnership between his actual slayer and this appellant, to rob and murder, amply met the test of legal sufficiency for submission to the jury. It was the jury's province to "weigh the evidence and adjust its value" *(Brinks v. Heise,* 84 Pa. 246). This the jury did intelligently and justly.

The other "questions involved" and pressed upon our attention require little discussion. The second one is: "Was it error to admit testimony of crimes committed

by defendant and assailant, and by assailant alone, prior to the killing, not connected with the killing?" The answer to this inquiry is found in what we have already said. In so far as they reveal a plan to rob and murder, as they clearly do, they *were* connected with the killing.

In the famous case of *People v. Molineux,* 168 N. Y. 264, 62 L. R. A. 193, 61 N. E. 286, the Court of Appeals of New York, in an opinion by Judge WERNER, said: "Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others: (5) the identity of the person charged with the commission of the crime on trial. . . . To bring a case within the exception to the general rule which excludes proof of extraneous crimes, there must be evidence of system between the offense on trial and the one sought to be introduced. They must be connected as parts of a general and composite plan or scheme, or they must be so related to each other as to show a common motive or intent running through both." In a footnote in Wharton's Criminal Evidence, Vol. 1 (10th ed.), page 150, that author says: "When system is once proved, each particular part of the system may be explained by the other parts, which go to make up the whole." See also *State v. Kernan,* 65 Md. 253, 4 A. 124.

The third "question involved" relates to the admission of testimony of crimes committed by defendant and assailant and, by assailant alone *after* the killing. Such testimony is admissible on the principles of proof already discussed by us.

The fourth "question involved" is: "Was it error to compel defendant to go to trial in a wheel chair suffering from an infected bullet wound in his left heel?" Our answer is, "No." Dr. Deitrick, who was called by the appellant to support the latter's petition for a con-

tinuance, was asked the following questions and made the following answers: "Q. Will he [the appellant] continue to suffer pain, the way the wound is healing? A. Every time he gets his foot dressed he will have pain. Q. The foot will have to be dressed for some time? A. Yes sir. It might take a year, or two years, before it is entirely all right." When a man sought by officers, for an alleged murder, resists arrest with a fusillade of bullets and gets shot in the leg he has no constitutional or legal right to have his trial postponed until his wound is healed.

The fifth "question involved" is: "Was it error to compel defendant to go to trial on the murder charge, immediately after trial before three separate juries for crimes unconnected with the murder charged, occurring on same night, where same evidence was introduced in murder trial?" While not accepting as a fact the statement that the "other crimes" for which the appellant was tried were "unconnected with the murder charged," we pass that by as unimportant in discussing this fifth question and our answer is "No." When a man plans an extensive program of crimes and elects to complete that program in a single evening, with only brief intermissions between acts, he cannot with justice complain if the Commonwealth in bringing him to trial attempts to imitate, even though it cannot equal, his celerity. No right of defendant was invaded by these rapidly successive trials.

The sixth and last "question involved" is: "Did the trial judge err in his charge?" The error complained of is that the trial judge said that "If he [Strantz] had a fully formed intention to kill, whether he killed Rowe or another, or aided and abetted in killing Rowe, he would be guilty." It is argued that the phrase, " 'whether he killed Rowe or another' was misleading to the jury and prejudicial to the defendant." We do not so view it. If Strantz and Yurcavage went out that night on a joint mission of robbery and murder, and, in

46

the pursuit of that plan, the life of Rowe was taken by one of them, either deliberately, maliciously, and intentionally, *or* in the attempted perpetration of a robbery, they were both guilty of murder in the first degree.

All the assignments of error are overruled.

The judgment is affirmed. The record is remitted so that sentence may be carried out.