Commonwealth *v.* Smith, Appellant, et al.

114

Argued September 29, 1942.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES, HIRT and KENWORTHEY, JJ.

*W. Hensel Brown,* for appellant.

*K. L. Shirk,* District Attorney with him *Paul A. Mueller,* for appellee.

OPINION BY CUNNINGHAM, J.:

Buford Smith has appealed from the judgment of the court below sentencing him to pay a fine of $200 and undergo imprisonment in the county prison for two years, following a verdict of guilty under an indictment in which he and William D. Sahm, Jr., were charged with having conspired to cheat and defraud the Northern Bank and Trust Company, of the City of Lancaster, of its monies, assets and credits, in the amount of approximately $69,000, in violation of section 302 of the Penal Code of June 24, 1939, P. L. 872, 18 PS §4302.

Sahm was the head bookkeeper in the employ of the bank and had charge, inter alia, of the individual depositors' ledger; Smith was the owner and operator of a cafe on the Manheim Pike, Lancaster County, known as "Smitty's". At the instance of Sahm, Smith transferred his account from the Fulton National Bank to the Northern Bank and Trust Company in September, 1939, and gave Sahm power of attorney to draw checks against and manage that account. About the same time Smith signed several blank checks and delivered them to Sahm.

The indictment charged an executed conspiracy, carried into effect by the fraudulent entry by Sahm in the books of the bank of fictitious deposits to the credit of the Smith account, in the aggregate amount of more than $70,000, and the drawing of checks by Sahm and Smith against these fictitious credits for their joint benefit, pursuant to a malicious, unlawful and corrupt agreement and understanding between them thus to defraud and cheat the bank of its monies and credits. When the defendants were called for trial, Sahm entered a plea of *nolo contendere* and Smith pleaded not guilty. During the trial Sahm was called as a witness by the Commonwealth. It was not controverted that during the period between September 19, 1939 and May 12, 1941, shortly before large defalcations by Sahm were discovered, fictitious credits, falsely purporting to represent actual cash deposits, were entered to the Smith account, against which checks were drawn, some by Smith himself and others by Sahm under Smith's power of attorney. Nor was it disputed that of the monies paid out by the bank upon checks drawn against the fictitious deposits, Sahm appropriated about $40,000 to his own personal use and the remaining $30,000 was ostensibly used by Smith in the maintenance and operation of his cafe. It is agreed upon both sides that, during the period covered by this case,

Smith made actual deposits of cash to his account in the total amount of approximately $8,000.

In the respective histories of the case it is stated that Sahm embezzled more than $300,000 from the bank, about one fourth of which abstractions were effected through the entering of the fictitious credits to the Smith account, and drawing checks against them. Sahm pleaded guilty to the other offenses and it is not contended that Smith had any connection with them. From uncontradicted evidence upon the record it also appears that no other depositor's account was juggled and manipulated as was the Smith account. The devices by which Sahm concealed temporarily his additional thefts from his employer do not appear of record, nor are they material in this case. It is obvious that if an arrangement could be made by Sahm with an actual depositor in the bank to permit his account to be manipulated as was Smith's the taking of even large sums of cash could be concealed for an indefinite period; the books would apparently balance and the shortage in the cash would not be discovered until a general count of the cash was made. It is equally obvious that no bona fide depositor's account could be so manipulated for more than a few weeks without his knowledge and consent.

Here, as in most cases of this kind, the Commonwealth relied upon the circumstantial evidence appearing upon the record coupled with Sahm's testimony relative to his relations with Smith and his (Sahm's) juggling and manipulation of the Smith account, and with Smith's admissions at the trial.

The general principles of law applicable to the trial of a charge of conspiracy have been frequently and clearly stated: "A conspiracy may be inferentially established by showing the relation, conduct, or circumstances of the parties, and the overt acts on the part of co-conspirators have uniformly been held competent

to prove that a corrupt confederation has in fact been formed. Where the acts of the parties indicate that they were acting in concert to a common end, the jury properly may be permitted to infer that the concerted action was the result of an unlawful agreement": *Com. v. Rosen et al.,* 141 Pa. Superior Ct. 272, 276, 14 A. 2d 833, and cases there cited.

It has been repeatedly held that "in conspiracy, the confederation is the gist of the offense." Where the conspiracy has been executed, i.e., carried into effect by overt acts done in pursuance of the original design, such acts may be regarded as proof of the unlawful intent, or, indeed, as sometimes stated, they may be considered as an aggravation of the criminality of the combination: *Com. v. Williams and Breese,* 102 Pa. Superior Ct. 216, 222, 156 A. 711.

"The heart of every conspiracy is a common understanding, no matter how it comes into being. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities": *Com. v. Strantz,* 328 Pa. 33, 43, 195 A. 75.

The Commonwealth contended that Smith personally withdrew from the bank about three and one half times as much money as he had actually deposited therein. Relying upon the circumstances under which these withdrawals were made and other circumstances developed in the testimony, it insisted it had presented sufficient direct and circumstantial evidence to require the submission to the jury of the question whether appellant had confederated and agreed with Sahm to cheat and defraud the bank.

Counsel for appellant, conceding the entering of the fictitious credits to his account and his withdrawing of large sums from the bank, contended below and argues upon this appeal that the evidence was not suf-

ficient to support a finding by a jury that the fictitious entries were made "with [appellant's] knowledge or made by or with his permission or that [appellant] knowingly withdrew monies from this account which were not legally deposited therein."

It therefore becomes our duty to examine the record with considerable particularity for the purpose of ascertaining whether it contains sufficient evidence to warrant the overruling by the trial judge of appellant's demurrer to the evidence for the Commonwealth, the denial of his point for a directed verdict in his favor and the submission of the case to the jury. Appellant was afforded access, through an accountant employed by him, to all the books and records of the bank. There is no sharp conflict in the evidence relative to any controlling fact; the contest is over the inferences legitimately deducible from the facts and circumstances appearing from the record.

Prior to July or August, 1939, Sahm and appellant had not known each other. Appellant had been operating his cafe for a number of years and it had been a losing business venture; he had borrowed $3,000 from his mother-in-law and had made three or four small loans of $300 each from certain loan companies. His bank account was in the Fulton National Bank. About that time appellant was introduced to Sahm at the Northern Bank and Trust Company by one of his (appellant's) employees. He made a small loan from Sahm of $100, with weekly repayments of $10 and $1 interest, or at the rate of 52% interest. Several subsequent small loans were also made by Sahm to appellant. There was nothing about these transactions to indicate that Sahm would be willing to come to the aid of an unsuccessful business enterprise unless the proposition would be largely to his personal advantage. It is beyond question that Sahm and appellant at this time entered into an *agreement* relative to the open-

ing by appellant in the Northern Bank and Trust Company of the account which became the vehicle through which that bank was defrauded of $70,000. Whether that agreement was a corrupt confederation designed from the beginning to supply the instrumentality—in the form of an apparently genuine account—through the manipulation of which the bank was to be cheated and defrauded to the mutual advantage of Sahm and appellant, as contended by the Commonwealth, or an ordinary business transaction, as asserted in behalf of appellant, can best be determined by scrutinizing the subsequent acts and conduct of the parties to the agreement.

The first overt act, to which the Commonwealth directs attention, was the transfer by appellant of his account from the Fulton National Bank to the Northern Bank and Trust Company early in August, 1939, and the giving by appellant a month later to Sahm of a power of attorney authorizing him to draw checks as attorney in fact for appellant against the account and to act for appellant in all matters pertaining thereto. In the meantime appellant had signed and delivered to Sahm three blank checks, one of which was subsequently filled out by Sahm for $1,100.

Both Sahm and appellant testified an oral agreement was entered into by them with relation to the financing and operating of the cafe and the control and managing of appellant's bank account, but they differ with respect to the terms of the agreement which, from any point of view, seems to have been exceedingly indefinite. Both testified the financial condition of the business was known to each to be "very bad". Appellant testified he had told Sahm how bad the business was and that the latter expressed a willingness to "finance [him] in remodeling the place and thought it would be a paying proposition." An excerpt from his testimony reads: "Q. Now then, what happened?   A.

And I opened this account, gave him this power of attorney, as I said, and he was supposedly handling all of the financial end of the business, and his connection with the business was—Q. Was there a partnership between you and him? A. No, sir, nothing any more than it was agreed upon that as he financed me to this extent, this remodeling, that I could pay him back. That is all he wanted, was his money back, and if we made money that I should pay him a reasonable profit, interest on his money ...... Q. Now, was there any arrangement made as to how much money was to be advanced to you? A. There was not. Q. How definite was any arrangement of that kind? A. There was no definite arrangement. He said 'I will take care of the financial end, and you worry about the success of the place.' Q. What were you to get to run this place, a week? A. $25 a week."

Sahm's version of the agreement was thus stated on cross-examination: *"The witness.* The place was run as a partnership orally. (*By Mr. Shirk*) Q. It was an oral agreement, or partnership? A. Only an oral agreement. Q. Will you tell the court and jury the terms of that oral agreement? A. When we made the agreement I told Mr. Smith that I would take care of the finances, and from that time on he had nothing to do whatsoever with the records, as far as the bank was concerned ......" [38a-39a].

Whether the relationship between these men was that of debtor and creditor, as asserted by appellant, or a partnership relation, as stated by Sahm, is of little, if any, importance in this case; whatever it was it continued until February or March, 1941, when appellant testified Sahm came to him and said, "I am through. From here on you are on your own."

Beginning September 19, 1939, Sahm caused a fictitious deposit of $190 to be entered to the credit of appellant's account and continued the making of

fictitious deposits to this account until May, 1941. The aggregate of all the legitimate deposits to appellant's account was only $8,334.46, and the fictitious deposits credited to the account totaled $70,540. These fictitious deposits were manipulated by Sahm's making out a deposit ticket to appellant's account, unaccompanied by cash or checks; the amount of the deposit ticket was credited on the Smith individual ledger by Sahm the bookkeeper. The bank then honored the checks drawn against these fictitious deposits with a consequent loss to the bank. Sahm was able to cover this up until May, 1941. Of the $70,000 so taken, about $30,000 was used to run and improve the cafe. Sahm appropriated the remaining $40,000 to his own personal use. During this period, the operating costs of the cafe were $101,390.12, and the total receipts $81,483.12, resulting in an operating loss of $19,907. Many improvements were made but they could only be verified from June 20, 1940, to May 12, 1941, in the amount of $2,156.96.

For the year 1939, appellant reported in his Federal Income Tax Return a loss on the cafe of $3,643.63, and for the year 1940, a loss of $9,808.61, in spite of an increase in inventory of $3,000.

The evidence appearing upon this record relative to thefts from the funds of the bank through the manipulation of appellant's account naturally divides itself into two periods of time: First, beginning September 3, 1939, with the power of attorney to Sahm, up to June 20, 1940, and the second, from that date until the discovery on May 12, 1941, of Sahm's abstractions. During the first period no records were kept by appellant or Sahm, and many of the checks, including all those signed by Sahm as attorney in fact, were destroyed. By the ledger cards in evidence it appeared that during this period the deposits credited to appellant's account aggregated $32,353.99, of which only

$1,518.99 were legitimate and $30,835 fictitious. Appellant produced cancelled checks for $5,611.62 and admitted others had been drawn. A more accurate picture of the overt acts involved is obtainable from the record for the period from June 20, 1940 to May 12, 1941, during which total deposits were entered in the sum of $43,775.22; of these $39,608.14 were fictitious and $4,167.08 legitimate. Sahm as attorney in fact drew checks payable to "cash" for $28,256.19 and to pay known cafe bills $2,197.05; appellant drew checks for $14,410.39. In addition cafe bills were paid by appellant with the cash received at the cafe.

As respects the division of the $70,540, abstracted from the bank and represented on its books by the fictitious deposits of that amount, into $40,000, admitted by Sahm to have been taken for his personal use, and $30,000 ostensibly for the operation of the cafe, it is sufficient to say that the evidence indicates that more than $12,000 was drawn by Sahm during the first period—September 3, 1939 to June 20, 1940,—and $28,000 during the second period—June 20, 1940 to May 12, 1941.

As already indicated, many of the records of the transactions during the first period were destroyed, but, in so far as appellant is concerned, the bank records show that he deposited during the first period only $1,518.99. Cancelled checks were produced showing that he drew at least $5,611.62 during that period and that he must have drawn considerably more than that amount—approximately $19,000. From the more complete records for the second period these figures appear: Appellant's actual deposits amounted to only $4,167.08, but he withdrew from the bank $14,410.39—an overdraft of $10,243.31. During this period Sahm paid bills for appellant in the amount of $2,197.05, making a total of $16,607.44, represented as having been used for appellant's business, as against a legiti-

mate deposit of only $4,167.08, or a loss to the bank of $12,440.36, which amount added to his apparent withdrawals during the first period approximates the $30,000 taken out of the bank for appellant's benefit.

It thus appears that in one year and eight months appellant *concededly* drew at least $20,000 from the bank in which he had deposited only $5,686.

As above stated, appellant testified Sahm told him about March, 1941, that he was through with appellant. But appellant's practice of drawing checks against the account regardless of the amount deposited therein continued. Some of appellant's check stubs are in evidence; none of them, however, contains any notation of deposits prior to March 27, 1941. Between that date and May 3, 1941, the evidence shows these deposits and withdrawals. There was a balance of $2.26 and $947 was deposited. Appellant, however, drew checks for $1,360.62, making an overdraft of $411.36, which Sahm made good.

No statement was rendered of the amount due from appellant to Sahm when the latter told appellant he was through. On the contrary, things seem to have gone on as usual until Sahm's peculations were discovered. Appellant continued to overdraw, Sahm continued to cover the overdrafts with fictitious deposits and to help himself from the cash as well.

The contention of counsel for appellant, to the effect that the evidence is not sufficient to support a finding that the fictitious entries were made with appellant's knowledge or permission, or that he knowingly withdrew monies from the account which had not been actually deposited therein, is based to a large extent upon the testimony of Sahm, who testified he made all the fictitious entries but never told appellant about them. His final statement on that subject was: "I don't know what he knew." Sahm also testified appellant never asked him for any statement of their

financial affairs or inquired where the money was coming from to run the cafe business.

Appellant seems to have made a studied and deliberate effort to avoid knowing the things concerning which any bona fide depositor in a bank would demand full and complete knowledge. He did not have a pass book, nor did he even ask Sahm how much he owed him, under appellant's theory of their relationship. He neither kept records of his own, nor did he ever ask the bank for a statement of his account. He was not a novice in business; he had been running his cafe for nine years; he knew how to run a legitimate bank account; he had one in the Fulton National Bank.

Appellant's absolute indifference to the state of his account is illustrated in the excerpt from his testimony: "Q. And do you know there were no deposits entered by you from November 17, 1939, until May 20, 1940? A. I don't know. Q. You don't know that. You never bothered to check that at all. And you did, however, continuously, during that time, draw out checks for the payment of bills, isn't that right? A. Yes, sir."

If the agreement charged in the indictment was entered into by Sahm and the appellant, the offense was complete the moment it was made, whether or not any overt acts were committed by either or both of them pursuant thereto, and, of course, it was not essential that the Commonwealth show appellant had knowledge of the manner in which Sahm falsified the books of the bank so that he could abstract $40,000 in cash and so that appellant in a little over a year and a half could draw at least $20,000 out of a bank in which he was bound to know he had deposited less than $6,000.

From this review of the practically uncontroverted evidence introduced at the trial we think it was the clear duty of the trial judge to deny appellant's motion

for a directed verdict in his favor and submit the case to the jury under proper instructions. It being admitted by appellant that he made an agreement with Sahm to open the account and give Sahm full control over its management, and the issue being whether their agreement merely contemplated an ordinary business transaction, as asserted by appellant, or was really a corrupt confederacy formed for the purpose of creating an instrumentality to be used for the purpose of cheating and defrauding the bank for their mutual benefit, as contended by the Commonwealth, various inquiries naturally arose out of the evidence which a jury, and only a jury, could answer one way or the other.

One of these inquiries would be whether appellant could have honestly believed that any business man of ordinary intelligence would invest unlimited amounts in a business which was losing money as rapidly as was his roadhouse—that Sahm had suddenly been converted from a loan shark into a philantropist.

Another would be whether the acts of appellant and Sahm subsequent to the making of the agreement were not consistent with, and only with, the hypothesis that Sahm needed a plan such as was here adopted to cover up a part of his embezzlements—or, in other words, needed an actual depositor in his bank who was willing to have his account falsified for the joint benefit of Sahm and himself. Also whether the existence of such an understanding would consistently account for and explain the utter indifference of appellant as to the status of his account, his drawing of checks for far more than he ever deposited in the bank, and other circumstances disclosed by the evidence concerning which he failed to give any consistent or satisfactory explanation.

In the course of his charge the learned trial judge, WISSLER, J., said: "Circumstantial evidence is good

evidence if believed; but it should point unerringly to the guilt of the defendant. Circumstantial evidence must exclude any reasonable hypothesis, save that of guilt"; and, in addition affirmed appellant's second point reading:

"When a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved and be consistent with them all. The evidence must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed. The facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence."

The only complaint made of the charge is indicated in the third question involved, as stated by appellant.

"Where a defendant in a conspiracy case denies his guilt and the other defendant to the alleged conspiracy pleads *nolle contendere* and exonerates the defendant on trial, is it proper for the court, in its charge, to refer to the defendant pleading *nolle contendere*, as an accomplice of the defendant?"

It is somewhat difficult to follow the argument of counsel for appellant upon this matter. The first reference during the trial to Sahm as an accomplice occurred when Harold Adams, the president of the bank, was called as a witness by the Commonwealth and was recalled for further examination by counsel for appellant, Mr. Brown, who made an offer to prove by the witness that Sahm had been embezzling money from the bank during a period of six years prior to the opening of appellant's account. The district attorney objected to the offer upon the ground that it was not proposed to show that any other depositor's account had been manipulated as was the account opened by appellant and upon the further ground that Sahm "has entered a plea of nolo contendere in this

case." The following question and answer appear at page 119a of the record: "THE COURT (to Mr. Brown): You concede that Sahm is his accomplice here? MR. BROWN: Oh! Yes. MR. SHIRK: If Sahm were on trial this would be proper; but Sahm is not on trial, and it is objected to. THE COURT: The objection is sustained and the offer is overruled."

In the opening portion of his charge the trial judge said: "Under [the] testimony, Sahm has admitted, practically at least, that he made fictitious entries on the books of the bank, and with reference to the account of Smith. Therefore, he is what we call an accomplice,—a party, by his own admissions, to what was done wrongfully at the bank. He is an accomplice, and, therefore, his testimony should be received with caution and should be carefully scrutinized by the jury. It does not mean that his testimony is untrue; but, in weighing his testimony, you will bear that in mind,—that he admittedly did something wrong with reference to these accounts at the bank, and, bearing this in mind, you determine whether he is telling the truth or not. He still may be telling the truth. There is no rule of law forbidding a conviction on the testimony of an accomplice without corroboration."

Counsel for appellant argues that "while Sahm might, strictly speaking, be considered an accomplice his testimony was not to the effect that Smith conspired with him or was guilty of any unlawful act," but, as expressed in his statement of the question involved, "exonerated" appellant, and therefore contends that the trial judge erred in saying to the jury, "There is no rule of law forbidding a conviction on the testimony of an accomplice without corroboration." The difficulty is that the statment of counsel that Sahm exonerated appellant is not supported by the evidence. The matter seems to have become involved in a confusion of thought with relation to the nature of the

offense charged in the indictment. If the indictment had charged Sahm and the appellant merely with having made fictitious entries in the books of the bank there would be some force to the contention now made by appellant's counsel because Sahm testified, as above indicated, that he made the entries himself and had not told appellant they had been made. That, however, was not the charge in the indictment. It charged that Sahm and appellant conspired and agreed to cheat and defraud the bank by various dishonest, malicious and unlawful acts—improper credits and withdrawals, etc. The making of the fictitious entries were merely some of the overt acts by which the conspiracy was carried into effect. Sahm testified to having applied to his own use $40,000 of the fruits of the conspiracy and to the application of some $30,000 to appellant's cafe business. The most that can be said about Sahm's testimony is that it was somewhat neutral. Moreover, it seems to be somewhat incongruous to speak of any one or more of the persons named in an indictment charging conspiracy as an accomplice or accomplices. If guilty of any participation in the commission of the offense they are co-conspirators. In any event, the instruction complained of here was more favorable to appellant than he was entitled to have.

We find no specific assignment of error supporting the fourth question involved, as stated by appellant, complaining of the rejection of testimony offered for the purpose of showing "the careless way in which the books were kept in the banking institution." We infer from our examination of the record that the statement is based upon the action of the trial judge in sustaining the Commonwealth's objection to an offer to show by the president of the bank that Sahm for a period of approximately six years prior to the opening of appellant's account had been abstracting money from the bank. The Commonwealth did not object to any effort

on the part of appellant to show that Sahm had manipulated other depositors' accounts in the same way appellant's account was handled. There was no offer to prove he had done so. In another part of the record counsel for appellant offered to prove the manner in which balances were run.

The factual situation shown in the case of *Com. v. Bardolph*, 325 Pa. 513, 192 A. 916, was so different from ·that appearing upon this record that the cases are readily distinguishable. In the final analysis each conspiracy case must be determined upon its own facts.

Here, there was *direct* evidence that appellant entered into and performed an oral agreement with Sahm to remove his bank account from the bank with which he was then doing business and open an account in his own name in the bank of which Sahm was the head bookkeeper, and gave Sahm a general power of attorney under which he (Sahm) could manage, control, and draw upon the account as he saw fit. The credibility of the respective stories of Sahm and appellant as to the real purpose of this confederacy between them was for the jury. As to the *circumstantial* evidence, consisting of proof of the subsequent overt· acts of Sahm and appellant and the circumstances surrounding their performance, we agree with the trial judge that this evidence, if believed, was sufficient in law to justify the submission of the case to the jury and to sustain its finding that the real purpose of the agreement was to provide an instrumentality through the operation of which the bank could and would be cheated and defrauded. The issues were adequately and fairly submitted to the jury and we find no error affecting this appellant.

An examination of this record discloses that an erroneous practice has been adopted in Lancaster County under pleas of nolo contendere, which should be corrected. Sahm and the present appellant were

jointly indicted. When the case was called for trial Sahm entered a plea of nolo contendere and a jury was selected to try appellant alone.

The first paragraph of the charge reads: "This indictment is against two defendants, William D. Sahm, Jr., and Buford Smith. Under a special plea, the court is trying William D. Sahm, Jr., and you are trying Buford Smith, under this indictment. You return a verdict as to Smith alone, and say by your verdict that you find Buford Smith not guilty, in case you acquit, or guilty, if you convict. Say nothing about Sahm; that is for the court."

In the Commonwealth's history of the case this paragraph appears: "Sahm plead nolo contendere and was adjudged guilty, after Smith was tried and found guilty by a jury of the charge of conspiracy to defraud the bank."

There is no authority in law for such procedure and we have so held in three recent cases: *Com. v. Rousch,* 113 Pa. Superior Ct. 182, 172 A. 484; *Com. v. Smith (No. 1),* 116 Pa. Superior Ct. 134, 139, 177 A. 68; and *Ferguson v. Reinhart,* 125 Pa. Superior Ct. 154, 159, 190 A. 153. See also, *Com. v. Holstine,* 132 Pa. 357, 361, 19 A. 273; *Com. v. Ferguson,* 44 Pa. Superior Ct. 626, 628-9 (RICE, P. J.).

In the Smith case, after citing the Rousch case, it was said: "We had occasion to define the proper practice upon the acceptance by a trial judge of a plea of nolo contendere. We there said that when such plea is tendered and accepted 'it is not the province of the judge to adjudge the defendant guilty or not guilty,' because, under the cases cited in that opinion, and particularly *Com. v. Ferguson,* 44 Pa. Superior Ct. 626, such plea, 'when accepted by the court, is, in its effect upon the case, equivalent to a plea of guilty.' Conviction and sentence follow upon it in the same manner as upon a plea of guilty—the only difference

being that a defendant cannot plead nolo contendere without the leave of the trial judge and it cannot be used against him, as an admission of guilt in any subsequent civil suit for the same act." See also *Teslovich et ux. v. Fire Ins. Co.*, 110 Pa. Superior Ct. 245, 168 A. 354.

As indicated in the Rousch case, the sole legal ground upon which any testimony may be taken when a plea of nolo contendere has been accepted is "to aid the judge in fixing the sentence."

The assignments of error are severally overruled. The judgment is affirmed, and it is ordered that the defendant, Buford Smith, appear in the court below at such time as he may be there called, and that he be committed by that court until he shall have complied with the sentence or such part of it as had not been performed when his appeal was made a supersedeas.

PER CURIAM, January 28, 1943:

The foregoing opinion had been prepared by Judge CUNNINGHAM before his death on December 6, 1942. It is now adopted and filed as the opinion of the Court.