J-S57015-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TEVON KASHAINE THOMAS | : | |
| | : | |
| Appellant | : | No. 1260 MDA 2018 |

Appeal from the Judgment of Sentence Entered February 28, 2018
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0003969-2016

BEFORE:  BOWES, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 31, 2020**

Tevon Kashaine Thomas appeals from his February 28, 2018 judgment of sentence imposed after a jury convicted him of first-degree murder and conspiracy to commit first-degree murder.  We affirm.

Appellant's conviction stems from the shooting death of Irvando Crooks (hereinafter, the "victim"), which occurred on September 2, 2016, inside of the house located at 70 North Sherman Street in Wilkes-Barre, Pennsylvania. On that evening, Appellant had an argument with the victim over their joint narcotics enterprise.  Appellant and the victim began struggling for control of a handgun, and the altercation culminated with Appellant's co-defendant, Keanu Pinnock, fatally shooting the victim.[1]

---

[1] The Commonwealth charged Appellant as both a principal and an accomplice to the victim's murder.  **See** Information, 1/4/17, at unnumbered 1.

Appellant was arrested and charged with criminal homicide and conspiracy to commit criminal homicide in connection with the victim's death. Mr. Pinnock pleaded guilty to third-degree murder in exchange for his testimony against Appellant. Appellant was convicted of first-degree murder and conspiracy to commit first-degree murder. On the murder conviction, Appellant was sentenced to life in prison without parole ("LWOP"). With respect to the conspiracy conviction, Appellant was sentenced to a consecutive term of fifteen to thirty years of imprisonment. Appellant filed a post-sentence motion in arrest of judgment, arguing that there was insufficient evidence to support the convictions. The motion was denied by operation of law pursuant to Pa.R.Crim.P. 720(B)(3)(a).

Appellant filed a timely notice of appeal. The trial court directed Appellant to file a concise statement of errors complained of pursuant to Pa.R.A.P. 1925(b). Appellant requested an extension in which to file his concise statement, but failed to properly serve the request upon the trial court. Following a request for reconsideration, Appellant timely submitted his Rule 1925(b) statement and the trial court issued its Rule 1925(a) opinion.

Appellant has raised two claims for our consideration:

1. Was the evidence insufficient to sustain Appellant's conviction for conspiracy [to commit murder of the first degree]?

2. Was the evidence insufficient to sustain Appellant's conviction for murder of the first degree?

Appellant's brief at 2 (issues renumbered). Our standard of review over these claims is *de novo*. "[H]owever, our scope of review is limited to considering

- 2 -

the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner." ***Commonwealth v. Rushing***, 99 A.3d 416, 420-21 (Pa. 2014).

Both of Appellant's claims assert that the Commonwealth's evidence was insufficient to support the underlying convictions.  We are mindful of the following principles, which will guide our review:

> Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty.  Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence.  Accordingly, the fact that the evidence establish a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence.  Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crime beyond a reasonable doubt, the [defendant's] convictions will be upheld.

***Commonwealth v. Sebolka***, 205 A.3d 329, 336-37 (Pa.Super. 2019).

We will begin by addressing Appellant's sufficiency claim with respect to his conviction for conspiracy to commit first-degree murder.  Under Pennsylvania, criminal conspiracy is defined as follows:

> **(a) Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning commission of such crime or of an attempt or solicitation to commit such crime.

. . . .

**(e) Overt act.**—No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S. § 903. In order to prove conspiracy, the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. *Commonwealth v. Montalvo*, 956 A.2d 926, 933 (Pa. 2008).

The altercation that erupted among Appellant, Mr. Pinnock, and the victim revolved around the parties' coordinated sale and distribution of narcotics (*e.g.*, crack cocaine). The victim acted as the putative head and supplier of this enterprise, both as the "money man" and as a kind of foreman who assigned jobs and controlled the workflow. **See** N.T. Trial, 1/9/18, at 172-75; **see also** N.T. Trial, 1/10/18, at 254-56, 260, 306. The victim employed Appellant and Mr. Pinnock (collectively, "the co-defendants") by putting them "on the line" selling narcotics. **See** N.T. Trial, 1/10/18, at 255-

56, 309. However, the co-defendants refused to sell narcotics out of their shared residence at 70 North Sherman Street. *Id*. at 257-60. As a result, the victim was planning to essentially fire both men by taking them "off of the line." *Id*. This would have prevented them from paying the rent by depriving them of approximately one thousand dollars in weekly income. *Id*. at 257-60, 307, 311, 388-89. Appellant stood to lose even more income, as he was in the habit of "taxing" less-senior sellers. *Id*. at 389-90.

Approximately four days before the shooting, the victim arrived at the residence and began complaining to Appellant that Mr. Pinnock had failed to sell enough narcotics the previous week. *Id*. at 391-94. As a consequence, the victim gave Mr. Pinncok's "shifts" to a different individual. *See* N.T. Trial, 1/9/18, at 174-75; *see also* N.T. Trial, 1/10/18, at 261-63, 394-97. During this confrontation, the victim directed his anger exclusively at Appellant, who was a more-senior member of the enterprise and had vouched for Mr. Pinnock to secure him a job. *See* N.T. Trial, 1/10/18, at 393-98. After the confrontation, Appellant expressed to Mr. Pinnock that he felt angry and disrespected by the victim's behavior. *Id*. at 398-99.

The victim stopped, again, in an attempt to retrieve both money[2] and guns from the co-defendants. *Id*. at 394-401. The co-defendants misled the victim about the whereabouts of the money and guns, claiming they were

---

[2] The victim's mother testified that, shortly before his untimely demise, he told her that Appellant owed him $300 and that he intended to collect the debt. *See* N.T. Trial, 1/9/18, at 191.

located at a different location. *Id*.at 401. Mr. Pinnock testified that he and Appellant followed the victim because they "wanted to see what he was going to do." *Id*. It is unclear what their ultimate purpose in following the victim might have been, as they were forced to abandon their stalking when they encountered a police patrol. *Id*. Thereafter, Appellant commented on multiple occasions that he was planning to kill the victim. *Id*. at 402-04.

The co-defendants were in the residence when the victim entered on the evening of September 2, 2016. *Id*. at 236, 344. The victim approached Appellant and again requested that Appellant give him both $300 in cash and at least one handgun. *Id*. at 267-73, 313-15. Appellant refused, drew a handgun, chambered a round, cocked the gun, and pointed it at the victim's head in a threatening manner. *Id*. at 267-73, 316-17, 411. The victim responded by striking Appellant and attempting to gain control of the gun, which caused it to discharge. *Id*. at 267-73, 318. Both the victim and Appellant ended up wrestling for control of the gun on the floor. *Id*. at 320.

Contemporaneously, Mr. Pinnock had ducked behind a wall in the kitchen when the victim first entered the residence. *Id*. at 320, 348, 407. Mr. Pinnock testified that although he "knew it was about to be an altercation," he "didn't want any parts [sic] with it" because he wasn't sure what the outcome would be. *Id*. at 407. Despite this testimony, Mr. Pinnock also testified that he had secreted a handgun in a kitchen cabinet near his hiding spot. *Id.* at 412-15. However, Mr. Pinnock was struck in the face as the parties' physical struggle ensued when he peeked his head out from his hiding

place. *Id*. at 409-10. Mr. Pinnock responded by grabbing the stashed handgun. *Id*. at 412-15. At that same moment, Mr. Pinnock saw that the victim was about to gain the upper hand in his struggle with Appellant. *Id*. at 413-16. It was at this moment that Mr. Pinnock took action, firing his handgun at the victim twice, which struck him in the back. *Id*. at 415-16.

The victim fell, then began to crawl away from his assailants. *Id*. at 417-22. Appellant retrieved the contested gun, along with its discharged clip. Appellant reloaded the gun, and attempted to "finish" the victim by shooting him in the head. *Id.* However, the gun jammed when Appellant pulled the trigger. *Id*. The victim stood up, ran into the street, and collapsed where he subsequently was found by law enforcement. *Id*. at 422.

At trial, Mr. Pinnock explicitly disclaimed that he had formed an agreement to kill the victim with Appellant prior to, or during, the altercation. *See* N.T. Trial, 1/11/20, at 460-61, 472 (testifying that there was "no agreement" and that his shooting of the victim "wasn't planned"). However, Mr. Pinnock conceded that he knew that there was "going to be problems" and had hidden a gun in the kitchen ahead of time. *Id*. at 494-96. Indeed, Mr. Pinnock's testimony confirmed that there was an understanding between Appellant and himself that they were ready to "[f]ight or shoot" in response to any aggression from the victim.

The parties have focused their arguments upon whether or not an "agreement" to kill the victim was ever formed between the co-defendants. *See Commonwealth v. Kennedy*, 453 A.2d 927, 929 (Pa. 1982) ("It is well

established that a common understanding or agreement is the heart of every conspiracy."). "Implicit in any conspiracy is proof . . . that an accused agrees to participate in the alleged criminal activity." ***Commonwealth v. Derr***, 462 A.2d 208, 210 (Pa. 1983). "Without this common purpose, a conspiracy cannot be maintained." ***Id***. at 209.

The trial court opined that "given the relationship between [Appellant] and [Mr.] Pinnock, [Appellant's] stated intention to kill [the victim] coupled with the fact that they armed themselves and thereafter discharged weapons at vital parts of [the victim's] body, provides sufficient competent evidence to establish the common goal of killing [the victim]." Trial Court Opinion, 1/28/19, at 15. We agree.

As a practical matter, the existence of a criminal agreement is rarely established by direct evidence. ***See Commonwealth v. Strantz***, 195 A. 75, 80 (Pa. 1937) ("An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities."). Accordingly, "[i]t is unnecessary to prove an explicit and formal agreement between the conspirators. The agreement necessary to support a conspiracy conviction can be wholly tacit so long as the surrounding circumstances confirm that the parties have decided to act in concert." ***Commonwealth v. French***, 578 A.2d 1292, 1294 (Pa.Super. 1990). In this context, "an agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of

and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Id*. (citing ***Commonwealth v. Lamb***, 455 A.2d 678, 685-86 (Pa.Super. 1983)).

Instantly, the testimony at trial indicates that the co-defendants had a close, fraternal relationship. In addition to being compatriots, they were also identically aggrieved co-workers who refused to return the victim's property. Several days prior to the shooting, they intentionally misled the victim regarding the location of his property so that they could follow him with some unspoken purpose in mind. After this attempting stalking was thwarted by law enforcement, Appellant openly discussed killing the victim. At this point, Mr. Pinnock stated that he was well aware of the potential for violence, and was ready to respond accordingly. Upon the victim's arrival at the residence, Appellant immediately armed himself while Mr. Pinnock stationed himself near a firearm. Although the fight began between just Appellant and the victim, Mr. Pinnock definitively entered (and ended) the fray soon thereafter. Moreover, the certified record also indicates that they took steps to conceal the killing afterwards. ***See*** N.T. Trial, 1/10/18, at 322-27, 351.

While Mr. Pinnock denied the existence of a conspiratorial agreement, his testimony bespeaks significant coordination and cooperation between the co-defendants. At worst, his testimony is inconsistent on this point. Such arguments implicate the credibility judgments, and we will not substitute our judgment for that of the jury. ***See Commonwealth v. Manchas***, 633 A.2d 618, 624 (Pa.Super. 1993) ("It is within the province of the jury to reconcile

inconsistent testimony, if possible, . . . and to believe all, part or none of the evidence, assigning to it whatever weight it deems appropriate.").

Instantly, the co-defendants' prior relationship and "their conduct before, during and after the criminal episode established a unity of criminal purpose sufficient for the jury to find conspiracy beyond a reasonable doubt." *Commonwealth v. Poland*, 26 A.3d 518, 523 (Pa.Super. 2011) (quoting *French*, *supra* at 1294-95). As such, Appellant's first claim is without merit.[3]

We now turn to Appellant's challenge to the sufficiency of his conviction for first-degree murder. Under Pennsylvania statute, a person commits first-degree murder when he intentionally causes the death of another human being. *See* 18 Pa.C.S. §§ 2501(a), 2502(a). Appellant is challenging the sufficiency of his conviction on two separate grounds, namely that there was insufficient evidence to establish: (1) his specific intent to kill the victim; and (2) overall liability. *See* Appellant's brief at 8-11.

Appellant's challenge to the sufficiency of the intent evidence is meritless. "To be guilty of first degree murder, each co-conspirator must individually be found to possess the mental state necessary to establish first degree murder—**the specific intent to kill**." *Commonwealth v. Wayne*, 720 A.2d 456, 464 (Pa. 1998) (emphasis in original). As noted above in our

---

[3] As noted above, Appellant has focused his arguments upon whether or not an agreement existed between the co-defendants. *See* Appellant's brief at 11-15. We note that: (1) Appellant manifested a specific intent to kill the victim, both by his words and deeds; and (2) Mr. Pinnock certainly committed an overt act by shooting the victim in the back. *See* 18 Pa.C.S. § 903(a)(1).

- 10 -

factual recitation, the Commonwealth adduced evidence establishing that: (1) Appellant stated several times that he intended to kill the victim; (2) Appellant pointed a loaded gun at the victim's head on two separate occasions; and (3) Appellant actually attempted to shoot the victim in the head, and was only unsuccessful when the handgun jammed.

Appellant's specific intent to kill the victim can be directly inferred from his prior threats. *See Commonwealth v. Predmore*, 199 A.3d 925, 932 (Pa.Super. 2018) (citing *Commonwealth v. Cross*, 331 A.2d 813, 814-15 (Pa.Super. 1974)). Moreover, the "use of a deadly weapon directed at a vital organ of another human being justifies a factual presumption that the actor intended death." *Commonwealth v. Alston*, 317 A.2d 229, 231 (Pa. 1974). Here, Appellant aimed a loaded handgun at the victim's head[4] and pulled the trigger. His action was only thwarted when the handgun inexplicably jammed and failed to fire. *See Commonwealth v. Jackson*, 995 A.2d 441, 444 (Pa.Super. 2008) ("[T]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts.").

Overall, both Appellant's statements and his actions permit an inference of his specific intent to kill the victim. As such, no relief is due.

---

[4] A person's head is considered a vital part of the body. *See Commonwealth v. Poplawski*, 130 A.3d 697, 710 (Pa. 2015); *see also Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa. 2015).

We now turn to Appellant's claim regarding liability. Assuming, *arguendo*, that Appellant did not fire the shot that ultimately killed the victim,[5] the trial court concluded that the evidence was sufficient to establish that Appellant was guilty of first-degree murder under co-conspirator liability. **See** Trial Court Opinion, 1/28/19, at 17 ("Pursuant to the law of this Commonwealth, it matters not that [Mr.] Pinnock inflicted a lethal gunshot wound to [the victim's] back."). We agree.

"Each member of a conspiracy to commit murder may be convicted of first degree murder, regardless of which of the conspirators inflicted the fatal wound, where the elements of first degree murder are made out as to that conspirator." **Commonwealth v. Busanet**, 817 A.2d 1060, 1064-65 (Pa. 2002). As set forth in our discussion immediately above, we have concluded that there was sufficient evidence to support the existence of a criminal conspiracy between Appellant and Mr. Pinnock. Furthermore, we may reasonably infer that Appellant possessed the specific intent to kill the victim. Finally, Mr. Pinnock inflicted a fatal wound upon the victim. As such, we agree

_____

[5] Appellant directs the bulk of his argument upon accomplice liability. The Commonwealth responds in kind, and also argues that Appellant could have been found guilty of first-degree murder pursuant to principal liability. **See** Commonwealth's brief at 15. Namely, it claims that Appellant may have been responsible for the victim's second wound to his right knee, which contributed to his death from exsanguination. **Id**.; **see also** N.T. Trial, 1/9/18, at 166, 197-98; N.T. Trial, 1/10/18, at 221-35. Because we ultimately affirm Appellant's conviction for first-degree murder on the grounds of co-conspirator liability *infra*, we will not address these aspects of the parties' arguments.

with the trial court's conclusion that there was sufficient evidence to establish Appellant's liability for first-degree murder as a co-conspirator.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/31/2020