## LAMBERTON v. FEDERAL DEPOSIT INS. CORPORATION.

### No. 8389.

Circuit Court of Appeals, Third Circuit.

Argued Dec. 22, 1943.

Decided Feb. 8, 1944.

---

8 5 Cir., 118 F.2d 651, 653.

9 26 U.S.C.A. Int.Rev.Code, § 23(m).

Irving H. Jurow, of Washington, D. C. (Francis C. Brown, of Washington, D. C., and John H. Russell, of Chicago, Ill., on the brief), for appellant.

W. Pitt Gifford, of Erie, Pa. (Robert M. Dale, of Franklin, Pa., on the brief), for appellee.

Before BIGGS, GOODRICH, and Mc-LAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

On December 20, 1941, the Federal Deposit Insurance Corporation[1] and the Lamberton National Bank of Franklin[2] executed a contract for the sale of all the Bank's assets to the F.D.I.C. This sale was part of a transaction whereby a second bank, the Exchange Bank and Trust Company,[3] was to take over the deposit liabilities and acceptable assets of the Bank, and was to receive the money paid by the F.D. I.C. to the Bank. The depositors of the Bank were to then become depositors of the Purchasing Bank. The statutory authorization for this transaction was subsection (n) (4) of the Federal Deposit Insurance Corporation Act, 12 U.S.C.A. § 264.[4] After this transaction had been consummated, this action was brought by the plaintiff, a depositor and officer of the Bank, against the F.D.I.C. to recover $1146.02. This sum was alleged to be the difference between the balance of his account in the Bank on the 20th of December and the balance as transferred to the Purchasing Bank. The court below made certain findings of fact and gave judgment for the plaintiff. The F.D.I.C. appealed to this Court.

The history of the transaction out of which the controversy arises follows. In September, 1941, the Bank submitted an application to the F.D.I.C. pursuant to the provisions of § 264(n) (4), requesting the F.D.I.C. to purchase and/or make a loan upon all the Bank's assets not acceptable for acquisition by the Purchasing Bank. The application provided that the Bank would submit all debts, fees, charges, or liabilities of the Bank, except those incurred in the normal routine business of the Bank, to an authorized representative of the F.D.I.C. for approval. The F.D.I.C., by a resolution adopted in October, authorized a purchase. The directors of the Bank on November 19, 1941, adopted a resolution, recognizing an impairment of the Bank's capital, concluding it was to the best interests of the depositors that the

---

[1] Hereinafter referred to as F.D.I.C.

[2] Hereinafter referred to as Bank.

[3] Hereinafter referred to as Purchasing Bank.

[4] It reads: "Whenever in the judgment of the board of directors such action will reduce the risk or avert a threatened loss to the Corporation and will facilitate a merger or consolidation of an insured bank with another insured bank, or will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank, the Corporation may, upon such terms and conditions as it may determine, make loans secured in whole or in part by assets of an open or closed insured bank, which loans may be in subordination to the rights of depositors and other creditors, or the Corporation may purchase any such assets or may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing assets of an open or closed insured bank. Any insured national bank or District bank, or, with the approval of the Comptroller of the Currency, any receiver thereof, is authorized to contract for such sales or loans and to pledge any assets of the bank to secure such loans."

Bank's affairs should be terminated and accepting the F.D.I.C.'s offer. A stockholder's meeting subsequently approved the proposed transaction. The purpose of the transaction was to permit a voluntary liquidation of the Bank and to prevent loss to its depositors.

The transfer and sale was to take place on December 20, 1941. About the first week of December, the F.D.I.C.'s representatives, one of whom was William T. Milne, were in attendance at the Bank, Milne being in charge of the transaction. It had been the Bank's practice to pay its officers and employees on the fifteenth of each month for the full month. On November 19, 1941, the employees of the Bank were told of the contemplated closing of the Bank on December 20th and that they would be paid for the full month. On December 9th the board of directors of the Bank adopted a resolution to the effect that no salaries had been discussed on account of the closing of the Bank and that the cashier was instructed to pay all employees, as usual, on December 15th, their full salaries for the month. On that date or prior thereto, Milne questioned the right of the Bank to pay its officers and employees any salaries for any period after December 20th since the Bank was going out of business on that date. The directors subsequently informally reconsidered the matter but decided to act as they had previously resolved and told Milne they were going to pay the full salaries notwithstanding his objections. And, on December 15th, the Bank, without Milne's approval, paid its officers and employees their salaries for the full month of December, in the amount of $3,228.22. The plaintiff in this action, Chess Lamberton, was during this entire time the president of the Bank and chairman of the board of directors of the Bank; Robert Lamberton was a director, vice-president and cashier; Richard Lamberton was a director, vice-president and assistant cashier.[5] As officers of the Bank these individuals, including the plaintiff, were paid their salaries for the entire month of December, 1941.

After the Bank's doors were closed for business on December 20, 1941, but while employees were still engaged both in matters pertaining to the day's affairs and the impending transfer, Milne, acting as agent for the defendant, caused to be entered as a charge against the plaintiff's checking account $1146.02, which was approximately one-third of the $3228.22 paid by the Bank as salaries for December. He also caused to be credited a similar sum to the assets of the Bank on the general ledger, thus "forcing" a balance. The result of this was that the plaintiff's beginning account in the Purchasing Bank was $1146.02 less than it would otherwise have been. He says that represents a loss to him and the defendant is responsible for it.

▌ When one looks for a legal foundation on which to build the plaintiff's claim, he encounters rough going. There is not involved in this case any question of the liability of the F.D.I.C. as an insurer of deposited funds under other provisions of the statute which, if applicable, would give the plaintiff a right against the insurer. This was a transaction between the Bank and the F.D.I.C., effected pursuant to the provisions of § 264(n) (4), quoted above. The parties, upon negotiation, make their own terms.[6] The fact that a particular claim against a bank was not taken into consideration in fixing the terms upon which the F.D.I.C. made a loan to a bank, gives the creditor of the bank no claim against the F.D.I.C. Thomas P. Nichols & Son Co. v. National City Bank of Lynn, 1943, 313 Mass. 421, 48 N.E.2d 49, certiorari denied, 1943, 320 U.S. 742, 64 S.Ct. 42.

The plaintiff was not a party to the contract between the Bank and F.D.I.C. Even if we make the bold assumption that the plaintiff somehow has standing to sue as a beneficiary he has no claim, for reasons presently stated. The contract between the Bank and F.D.I.C. was carried out according to its terms. Since this point was evidently a source of confusion in the court below, a word may be said upon it.

When the Bank closed its doors at 12 o'clock noon on December 20, 1941, the plaintiff's balance on the books was $4,832.26. The agreement of sale and the negotiations between the Bank and the F.D.I.C. contemplated that the initial purchase price to be paid for the Bank's assets "will

---

[5] There were two other directors.

[6] Note in the statute quoted the phrase "upon such terms and conditions as it may determine". Grammatically it is not too clear whether the quoted clause modifies in addition to the loan provision, the purchase provision in the statute. However, apart from this particular clause, the F.D.I.C. undoubtedly can state its purchase price.

equal the aggregate amount of deposit liabilities of the Bank as shown by its books of account as of the close of business * * *" on December 20, 1941. What was meant by this clause was the liabilities to the depositors after their accounts had been credited and debited for that day. There were checks paid and deposits made on that day, and before the books of the Bank could be closed for the day, each account had to be balanced. Plaintiff's own witness, a bookkeeper at the Bank on the date it closed, testified to this effect. She posted the plaintiff's balance, arrived at a figure of $4832.26, and then had to check it with the general ledger, prepared by another of the Bank's employees. In making this check, she found that the general ledger was short of her figure by $1146.02. The Bank's employee in charge of the general ledger told her that an employee of the F.D.I.C. had required him to enter this figure. He instructed the bookkeeper to use the amount in the general ledger to balance her account.

■ The contract of sale was executed, later, in the evening of December 20th. It stated that the initial cash purchase price was $2,494,187.46 which was "intended to equal but not to exceed the aggregate amount of the deposit liabilities of the Bank as at the close of business * * *, as shown in Exhibit 'A' [The balance sheet of the Bank as of close of business on December 20th] hereto." Then there is the further statement "The Bank hereby warrants Exhibit 'A' to be true and correct. * * *" The agreement of sale was signed by the plaintiff as president of the Bank. It is not disputed that the purchase price stated in the agreement and the balance shown in Exhibit "A" was calculated on the basis of plaintiff's deposit balance being $3686.24, not $4832.26. So much for the contract; whatever rights plaintiff may have had as a beneficiary were fully fulfilled by performance by the defendant.

Has the plaintiff a right against defendant because of a tort? The plaintiff's stated theory, which seems to have been accepted by the trial judge, was that the defendant was guilty of a conversion. Conversion in the common-law sense it certainly is not. There was no dealing with any chattel of the plaintiff, no interference with possession, none of the elements, in fact which place the conduct complained of in the conversion category. The claimed tort must be in that much less clearly defined field of liability for tortious conduct which interferes with the economic interests of another. Cf. 4 Restatement, Torts (1939) § 871.

■ Assume that had it not been for what defendant, through its employee, Milne, did on December 20th, plaintiff's account with the Purchasing Bank would have been $1146.02 more than it was. Was its conduct in bringing about such result tortious? The answer is clearly in the negative. The fact that two people in making a contract between them cause economic loss to a third person does not, without more, give the third person rights. Otherwise, a disappointed competitor would have a tort claim against his successful rival in every business deal. Cf. 3 Restatement, Torts (1938) § 708 and comment d. Some acts, otherwise not a source of liability, may become so if their primary purpose is to cause harm to another, such as the pretense of business competition for the real purpose of causing another harm. Id. § 709. But nothing of that sort can be found here. The Bank's original proposal agreed that all but routine expenditures should be submitted to the defendant for approval. The defendant's agent in charge had made timely objection to the payment of unearned salaries to those who were employed by the Bank, and reiterated his objection after the directors, of whom plaintiff was one, had nevertheless voted them. The salaries having been paid despite this, the defendant refused to cover the deposit of the Bank's president and director who not only voted for the payment of the salaries, but received his salary in full for the month of December. This the defendant could do under the statute and as a matter of contract. And it cannot be disputed that its reasons for refusing to cover the plaintiff's deposit were legitimate since it had a direct financial interest in the transaction which would have been adversely affected by what it considered to be an unwarranted depletion of the assets it was going to purchase. It has been argued to us that this payment was illegal and the plaintiff and other directors are personally responsible for its return. We need not pass on this question in holding that what defendant did in pursuance of this theory was not a tort to the plaintiff.

The judgment is reversed and the cause remanded with directions to enter judgment for the defendant.