No. 37,025

FEDERAL DEPOSIT INSURANCE CORPORATION, *Appellee*, v. H. J. CLOONAN and HELEN M. CLOONAN, Husband and Wife, *Appellants*.

(193 P. 2d 656)

Opinion filed May 8, 1948.

*Elmer W. Columbia,* of Parsons, argued the cause, and *John B. Markham* and *Herman W. Smith, Jr.,* both of Parsons, were with him on the briefs for the appellants.

*A. L. Foster,* of Parsons, argued the cause for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: These were two replevin actions, consolidated for trial in the district court. The jury answered special questions and returned a verdict for plaintiff in each of the cases. Defendants have appealed.

In the trial court, in case No. 5,437, the petition was filed February 3, 1942, and an amended petition April 2, 1943. In this plaintiff alleged that it is a corporation organized and existing under Federal statutes (12 U. S. C. A., § 264); that the defendants are husband and wife, and their address in Parsons was stated; that plaintiff has a special ownership and interest in and is entitled to the immediate possession of certain personal property, in a list attached to the petition as "Exhibit A," by virtue of a certain note and chattel mortgage executed by defendants, and that on June 9, 1941, defendants executed and delivered to the Exchange State Bank of

Parsons their promissory note in the sum of $2,500 and a chattel mortgage upon the property described in "Exhibit A" to secure the payment thereof; the note and mortgage were attached to the petition as "Exhibit B" and "C"; that on June 21, 1941, the note and chattel mortgage were sold, assigned and delivered by the Exchange State Bank to plaintiff for a good and sufficient consideration, being as follows: That the Exchange State Bank of Parsons, on January 1, 1934, became a member of the temporary Federal Deposit Insurance Fund, created pursuant to section 12B of the Federal Reserve Act (sec. 8 of the act of June 16, 1933; 48 Stat. 168), and was insured under that fund until August 23, 1935, when it became an insured bank under 12B of the Federal Reserve Act, as amended (sec. 101 of the act of August 23, 1935; 49 Stat. 684; 12 U. S. C. A., § 264), and was insured under that act until June 21, 1941, on which date, because of its insolvent condition, it quit business, and as provided by paragraph 4, subsection (n), 12 U. S. C. A., § 264, the deposit liabilities were assumed by the State Bank of Parsons, which purchased certain assets of the Exchange State Bank, referred to as acceptable assets; that all the remainder of the assets of the Exchange State Bank were purchased by plaintiff, the consideration therefor being paid to the State Bank of Parsons on the basis of the difference between the value agreed upon between plaintiff and the State Bank of Parsons of its acceptable assets of the Exchange State Bank of Parsons and the deposit liabilities of the Exchange State Bank of Parsons, which difference amounted to the sum of $420,259.87; that included in the assets acquired by plaintiff from the Exchange State Bank of Parsons was a note and chattel mortgage, previously mentioned; that plaintiff is a governmental agency and instrumentality, created by an act to stabilize and promote the stability of banks, to protect depositors, and to preserve the solvency of insured banks and to keep open channels of trade, commerce and exchange, and for such reasons plaintiff corporation is endowed with a public interest; that the note and mortgage previously mentioned were given to the Exchange State Bank at the time that bank was insured by plaintiff and was a part of the assets of such bank, shown on its books as such and relied upon by plaintiff as a part of the assets of the bank; that the note was complete and regular on its face, was dated June 9, 1941, and due July 9, 1941; that plaintiff became a holder of the note and mortgage before they were due, to wit, on June 21, 1941, without notice of any infirmity in the

instrument or defect in the title of the Exchange State Bank, and that plaintiff took the note in good faith and for value, as above set forth, and is a holder in due course of the note and chattel mortgage. There were further allegations that the conditions of the note and mortgage had been broken; that payment had been demanded and refused, and possession of the property had been demanded and refused, and that the total value of the property listed in "Exhibit A" is $1,407.70. The prayer was for judgment awarding plaintiff the possession of the property, and if its possession could not be given, that plaintiff have judgment against defendants for the value as set forth in plaintiff's petition and for its costs. In this case the sheriff took possession of the personal property and a redelivery bond was given.

In the other case (No. 5,439) the petition was filed on February 5, 1942, and an amended petition filed April 2, 1943. This was to recover a number of automobiles in which plaintiff alleged a special ownership and interest by virtue of a note for $9,350 executed by defendants June 9, 1941, and delivered to the Exchange State Bank of Parsons, and a chattel mortgage executed by defendants to the bank on the same date upon automobiles described in a list attached to the petition as "Exhibit A." A copy of the note and mortgage was attached to the petition as Exhibits "B" and "C." It was alleged that certain payments had been made upon the note and that there was a balance due at the time of the amended petition of $5,749.84. It was alleged the value of the property described in "Exhibit A" was $8,355. There were other allegations in the petition substantially the same as in case No. 5,437 pertaining to plaintiff's existence under the Federal statutes and how it procured possession of the note and chattel mortgage. The prayer was for possession of the property described in "Exhibit A," and if such possession could not be given that plaintiff have judgment for the value of the property together with its costs. Upon the order for delivery the sheriff found none of the property listed in "Exhibit A." On June 11, 1943, the cases were consolidated by an order of the trial court and thereafter all pleadings were filed in the consolidated case.

H. J. Cloonan filed his amended answer in the consolidated cases in which he admitted plaintiff's corporate existence, as alleged, and that the Exchange State Bank was an insured bank at the time it closed, June 21, 1941, under 12 U. S. C. A, § 264, and alleged that

the Exchange State Bank paid a consideration for the insurance, as provided in the act. He further alleged that about May 1, 1941, the exact date being unknown to defendant but known to plaintiff, the plaintiff learned that the Exchange State Bank of Parsons was insolvent and sent its auditors and accountants to check its affairs, and about June 1, 1941, caused the removal of its president, Harold E. Reece; and plaintiff, through its agents and officers, ascertained and determined that the bank was insolvent and placed in charge of the bank its duly authorized agent, W. L. Webber, who called the board of electors to elect a new president, and that while the bank kept its doors open from that time until June 21, 1941, the bank was in fact in charge and control of plaintiff and its officers and agents, who were attempting to reorganize the bank as a going concern; that while the acts of the officers and directors of the Exchange State Bank were controlled, directed and supervised by plaintiff, and plaintiff was unable to perfect the reorganization of the bank, certain of its assets were sold to the State Bank of Parsons and the remainder of the assets, including the notes and chattel mortgages described in plaintiff's amended petitions were taken over and acquired by plaintiff, and plaintiff assumed the remaining deposit liabilities; that when plaintiff took charge of the management of the affairs of the bank, about June 1, among its assets were the following-described notes of the defendant, H. J. Cloonan: No. 38,321, dated April 23, 1941, due June 22, 1941, $950, unsecured; No. 38,322, dated April 14, 1941, due May 14, 1941, $6,900, unsecured; and No. 38,323, dated April 30, 1941, due June 29, 1941, $4,000, secured by a chattel mortgage described in plaintiff's petition in case No. 5,437, signed by H. J. Cloonan; that these three notes were signed and executed on April 30, 1941; that the bank was indebted to defendant in a large sum and defendant was anxious that the bank remain in business; that on or about June 3, 1941, W. L. Webber, the authorized agent of plaintiff in charge of the bank, caused defendant to be summoned to the bank for a conference with W. A. Smith, acting cashier of the bank, under the direction of W. L. Webber, both of whom in fact were acting as agents for plaintiff, even though W. A. Smith had the nominal title of cashier; that during the oral conversation W. L. Webber was present and gave whispered and oral directions to W. A. Smith; that it was there stated by them to defendant orally that plaintiff was endeavoring to work out a plan whereby the Exchange State

Bank could be kept open as a going concern; that defendant's attention was called to his three notes above mentioned and it was there stated to defendant that the property covered by the $4,000 chattel mortgage was inadequate; that the $6,900 and $950 notes were unsecured, and even though two of the notes were not due, that if the defendant would secure the notes and make the same eligible as an asset of a going concern, the bank would be kept open, provided other ineligible assets were likewise made eligible sufficient to constitute a proper reserve in the bank; that defendant stated that a check of the affairs of the bank had indicated, and a check of his books showed clearly, that payments had been made upon the above-described notes for which defendant had received no credit; that it was thereupon orally stated to defendant that if he would execute note No. 38,679 and secure the same by a chattel mortgage upon used cars to which defendant had title, a list of which was then presented to defendant, and if he would execute note No. 38,680 and give a new chattel mortgage in the sum of $2,500 in place of a $4,000 chattel mortgage on the personal property described in plaintiff's petition in case No. 5,437, and if defendant would cause his obligations, which were then due and not due, to be renewed, and sign the papers, and cause his wife to sign the same, that the notes and chattel mortgages would not be dated and would not be placed in the assets of the Exchange State Bank until it was determined that the bank could be continued as a going concern, and in the event the bank was not continued as a going concern and its doors kept open that the notes and chattel mortgages would be returned to defendant and would not be placed in the assets, and in the event the bank was closed and taken over by plaintiff the only obligation of defendant in the bank would be the $950 note, the $6,900, both unsecured, and the $4,000 secured by a chattel mortgage on his shop equipment and his furniture and fixtures; that defendant stated to W. A. Smith that the list of used cars which was submitted to him and described in the chattel mortgage set forth in plaintiff's petition in case No. 5,439 were not in Labette county, and that most of them were in Montgomery county, and that he could not, without checking the same, determine if the cars were in his possession or otherwise; that defendant further stated to the agents of plaintiff that his obligations would be materially reduced if he had credit for the payments his record showed had been made, and in addition thereto that he had an

account against the bank; that it was then stated to the defendant that in either event, that is to say, the closing of the bank or the bank being kept open, the defendant would be given credit for such payments as he had made and for such valid open account as he had against the bank. It was further alleged that, acting upon the agreement and believing the representations of the parties that the bank would be kept open, this defendant caused his wife, Helen M. Cloonan, to sign two blank notes and two blank chattel mortgages, and that this defendant signed the notes and chattel mortgages described in plaintiff's amended petition in the above cases with the exception that neither of the notes and neither of the mortgages was dated, and with the explicit agreement and understanding that they were not to be dated until and only in the event the bank was kept open as a going concern, and that at the time he signed the same and handed the notes and chattel mortgages to W. L. Webber they were not dated, but were otherwise in the same condition as set forth in the above cases.

Defendant further alleged that the bank was not kept open, and closed its doors on June 21, 1941, and that the notes and chattel mortgages above referred to were wrongfully dated without authority of either defendant and the date of June 9, 1941, was inserted in the instruments without authority of defendant, and the same were placed in the assets of the Exchange State Bank; and defendant therefore specifically denied the execution of the notes and chattel mortgages described in plaintiff's amended petition, as they are set forth, and alleged that the same are invalid and void, and that plaintiff, through its officers and agents, had full knowledge of the facts he had pleaded herein; that the notes and chattel mortgages should be decreed null and void and returned to defendants, and that defendant be credited with the payments hereinafter described in the three valid notes, being Nos. 38,321, 38,322 and 38,323, which notes were kept by plaintiff in the Exchange State Bank and never were delivered to defendant, for the reason that the three notes were valid obligations and were not renewed or supplanted by notes 38,679 and 38,680. Defendant further alleged that he is entitled to the following credits and payments upon his valid obligations, which payments he made to the Exchange State Bank as follows: May 16, 1941, $2,500, represented by defendant's check No. 5,717, drawn on the Exchange State Bank of Parsons and charged to his account, for which he was given no credit on his obligations; May 17, 1941,

$4,000, defendant's check No. 5,823, drawn on the Exchange State Bank, charged to his account, for which he was given no credit; May 24, 1941, defendant's check No. 5,875 for $3,200, drawn on the Exchange State Bank of Parsons, which check was charged to his account and for which he was given no credit on his obligations; that these checks totaled $9,700; that defendant has made the following payments, which represent the net proceeds from automobiles described in the chattel mortgage in case No. 5,439, to the Exchange State Bank from June 14 to June 21, 1941, while the same was being operated under the direction of plaintiff; and after that date to the Federal Deposit Insurance Corporation, the following sums: (Here are listed payments on various dates from June 14 to August 23, 1941, which, with an adjustment of interest of 94 cents on December 15, 1941, totaled $3,455.94.) Other credits were claimed, as a result of which defendant alleged plaintiff is indebted to him in the sum of $346.29, which the court should decree to be a preferred claim and should be paid in full to defendant.

It was further alleged that plaintiff wrongfully caused an order of garnishment to be issued in case No. 5,439 of funds due defendant from the Fidelity and Deposit Company of Maryland; and on November 5, 1942, under the order of garnishment, the sum of $1,569.70 was paid to the clerk of the court; that at the time of issuing the garnishment defendant was not indebted to plaintiff, and that defendant is entitled to judgment for the amount, with interest, and a reasonable attorney's fee.

It was further alleged that the $9,350 note and chattel mortgage sued upon in case No. 5,439 and the $2,500 note and chattel mortgage sued upon in case No. 5,437 were never lawfully delivered, but were delivered conditionally, as previously set forth, and the agents of plaintiff knew that the bank could not be kept open, and the attempted renewal and substitution of those instruments for the valid obligations of defendant to the bank at that time never became effective; that the agents of plaintiff were attempting to secure a renewal of the obligations and securities under the representations made by them, and that the only obligations owed by defendant to the bank at that time were the three notes, $950, $6,900 and $4,000, as above set forth, which notes are not in possession of defendant, were never returned to defendant, and that the notes have been fully paid; that defendant is not indebted to plaintiff in any sum, and that plaintiff is indebted to defendant, as set forth herein.

Further answering, the defendant denied each and every allegation contained in plaintiff's second amended petition. The prayer was for judgment against plaintiff for $346.29, against the assets of the Exchange State Bank and for interest at six percent on $1,569.70 from November 5, 1942, and that the court order and direct the clerk to pay defendant the $1,569.70 in his hands held in garnishment and for reasonable attorney's fees, costs, and such other relief as may be proper. This answer was sworn to by H. J. Cloonan and signed by his attorneys, and attached thereto was an "Exhibit A," which is a copy of his account as pleaded.

Plaintiff filed a reply to the answer of H. J. Cloonan, which contained a general denial, and alleged that W. L. Webber was an examiner of plaintiff and was in the Exchange State Bank for the purpose of examining the bank on behalf of plaintiff and assisting the banking department of the state of Kansas in its examination; that defendant had actual knowledge of the status of W. L. Webber, knew that he was an examiner and what authority he had, and knew that he was not in charge and control of the management of the bank; specifically denied that the notes were delivered by defendant to W. L. Webber, and further alleged that defendant knew the notes were placed in the assets of the bank, and that after the closing of the bank continued to make payments on the notes and at no time demanded their return on the ground that they had been conditionally delivered and were not valid obligations; that defendant knew at the time of the closing of the bank that his notes were among the assets of the bank and that by reason thereof he is now estopped from denying their validity; that plaintiff's notes were placed in the assets of the bank prior to plaintiff's purchase and acquisition thereof; that defendant voluntarily delivered the notes to the bank, knew they were placed in the records thereof, and knew, or should have known, that the notes were assets of the bank and so considered by plaintiff, and as a result thereof, and because plaintiff is a governmental agency created by an act of congress to stabilize banks, defendant is now estopped to deny the validity of the notes.

Plaintiff further denied that the checks referred to by defendant in his answer were payments on the indebtedness which plaintiff is now suing on; "that plaintiff does not know what said checks were in payment for or whether said bank ever received said payments or the benefit thereof"; that it was the practice of defendant to obtain loans from the bank through its coöperation with Harold Reece

which were in excess of defendant's loan limit with the bank; that although plaintiff does not know the various amounts or the different times such loans were obtained its loans were made on defendant's notes, which were never shown on the records of the bank, and if and when the notes were repaid, defendant's checks in payment thereof would go through the bank but no credit would be shown on the bank's records for which the checks were in payment; that defendant has knowledge of such transactions and has books and records in his possession to show the dates and amounts of such excess loans, and such practice was contrary to proper banking practices, and that for such reason plaintiff is unable to state what checks defendant refers to were in payment of, if any, except that they were not in payment of notes here in suit. This reply was verified by plaintiff's attorney on October 23, 1943, and reverified by the attorney on July 24, 1945. The verification contains a sworn denial of agency.

The defendant, Helen M. Cloonan, filed a separate answer in which she specifically denied that she signed the notes and chattel mortgages described in plaintiff's petitions in the form in which they appear therein, and alleged that she is the wife of the defendant, H. J. Cloonan; that he is and was at all times mentioned in plaintiff's petition the owner of the Cloonan Motor Company, an automobile agency in Parsons; that she had no interest whatever in the agency; that she signed two blank notes and two blank chattel mortgages which were undated and were not filled out and for which she received no consideration; that she was informed by her husband at that time that he was indebted to the Exchange State Bank on an unsecured note for $950, an unsecured note for $6,900, and a note for $4,000 secured by a chattel mortgage on equipment and furniture in the automobile agency; that at the time she signed the blank notes sued upon she was informed by her husband that he was endeavoring to determine the amount of his obligations to the Exchange State Bank upon which he had made payments and for which he had received no credit, and that it had been represented to him by the agents of plaintiff that if he would execute the two notes and leave them with the agent of plaintiff at the Exchange State Bank the notes would not be used unless the Exchange State Bank continued in operation, and that a reconciliation of credits and debits would be made and he would receive the credits for which he was entitled, and that unless the Exchange State Bank was kept open the notes she signed in blank were not to be used, and acting upon

the statements of her husband she signed the two blank notes and two blank chattel mortgages, which were filled in after she had signed them and which she is informed and believes are the $2,500 note and chattel mortgage described in case No. 5,437 and the $9,350 note described in case No. 5,439, and that unless the arrangements above referred to were carried out the notes would never be used and would not be valid notes; and she alleged that the Exchange State Bank and the plaintiff had no authority to accept the notes and chattel mortgages sued upon and that the same are therefore void, and that she signed the same solely for accommodation, as stated in her answer. She prayed that the plaintiff take nothing and' that she recover her costs. This was verified by the defendant and signed by her attorney. Plaintiff's reply to this answer was a general denial.

The parties agreed upon facts to be accepted by the court and jury without further proof as follows: (1) That plaintiff is a corporation and governmental agency created by an act of congress to stabilize and promote the stability of banks and to insure depositors of all banks which are entitled to the benefits of insurance, as provided by an act of congress. (2) That the Exchange State Bank was a banking corporation organized under the laws of Kansas, and from August 23, 1935, to June 21, 1941, was an insured bank of and under the plaintiff. (3) That defendants are husband and wife and have resided at a stated address in Parsons, Kansas, and that since about May 9, 1939, H. J. Cloonan operated an automobile business in Parsons under the firm name of Cloonan Motor Company. (4) That on June 21, 1941, the Exchange State Bank was closed because of its insolvent condition. (5) That on June 21, 1941, the liabilities of the Exchange State Bank totaled $469,801.12; that the bank owned acceptable assets of $49,541.25; that to effect the assumption of liabilities of the Exchange State Bank by the State Bank of Parsons plaintiff purchased the unaccepted assets for the sum of $420,259.87 from the Exchange State Bank, which thereupon assigned to plaintiff all its unacceptable assets. Thereupon the Exchange State Bank sold and assigned to the State Bank of Parsons its acceptable assets for the face value thereof and assigned its right, title and interest to the proceeds of the sale of the unaccepted assets to the State Bank of Parsons. Thereupon plaintiff drew its check payable to the State Bank of Parsons, a bank also insured by plaintiff, in the sum of $420,259.87, and the State Bank

of Parsons assumed the deposit liabilities of the Exchange State Bank, which was done with the approval of the state bank commissioner of Kansas and the Exchange State Bank and plaintiff; that this was done in all respects as provided by law and in discharge of the insurance liability to the depositors of the Exchange State Bank. (6) That included in the unacceptable assets purchased by plaintiff was the $2,500 note and mortgage sued upon in case No. 5,437 and the $9,350 note and mortgage sued upon in case No. 5,439. (7) That in case No. 5,437 the articles are in possession of the defendant, H. J. Cloonan, by virtue of a redelivery bond. Paragraphs 8 and 9 deal with certain payments made by defendant, which need not be detailed. (10) The signatures of defendants on the instruments sued upon are genuine. (11) The notes sued upon each bears a genuine endorsement of the Exchange State Bank and the genuine signature of William A. Smith, its cashier. (12) That the plaintiff at all times subsequent to June 21, 1945, "has been and now is, for valuable consideration, the owner and holder of all obligations due the Exchange State Bank" from defendants as of that date, including all alleged notes and chattel mortgages.

At the trial plaintiff called as a witness A. M. Dunn, who testified that he lived at St. Louis and had been engaged in the banking business about sixteen years; that he was appointed liquidator of the Exchange State Bank and assumed his duties on June 29, 1941, and continued in that capacity for plaintiff until September 16, 1944. He identified the notes and chattel mortgages in suit and computed the amount due thereon. The agreed statement of facts was introduced in evidence.

Defendants called H. J. Cloonan as a witness. He testified that he was the De Soto and Plymouth distributor and owned the Cloonan Motor Company in Parsons; that he moved to Parsons early in 1939 to engage in the automobile business and purchased the Quality Motor Company from one Roy Marshall, became acquainted with Harold Reece of the Exchange State Bank and did business with that bank and with other banks; that the instruments sued upon are not in the same condition they were the last time he saw them before the previous trial of this action; that before they were signed he had several conferences with Mr. Smith, cashier of the Exchange State Bank, and with Mr. Webber, F. D. I. C. examiner, in the latter part of May and the first of June, 1941; that the gross amount of his notes to the Exchange State Bank, about April

25, was $11,850; that he employed Cliff Stevenson, a certified public accountant, to audit his books. Mr. Stevenson was closing his work and wanted a certificate from the bank as to Cloonan's indebtedness. That William A. Smith, cashier, gave Mr. Stevenson a certificate "that the actual liabilities of H. J. Cloonan to the Exchange State Bank on December 31, 1940, were $10,900, represented by two notes, one for $4,000 and one for $6,900." This certificate was offered in evidence with a notation of defendant's note for $950 to the bank of a later date. That on May 16, 1941, he took to the bank and gave to Reece his check for $2,500 and told him to apply it on his large note; that he had never received any credit for that payment; that on May 17, 1941, he gave Harold Reece his check for $4,000 and told him to apply it upon his original obligations; that he never received any credit for this payment. Both checks were charged to his account and were offered in evidence. That after the bank closed he learned from Mr. Webber, F. D. I. C. examiner, that his check for $3,207, dated May 2, had been charged to his account; that he received no credit. He testified that he took this check to Reece and told him to apply it upon his note. Plaintiff admitted that the check had been charged to defendant's account and the check stub was offered in evidence. The witness further testified that about May 29 or June 1 he was called to the bank by Mr. Deb Smith, the cashier, and the following transpired:

"A. He was Cashier at that time in the bank. This was after Reece was out of the bank, and Deb told me the bank was in very bad shape, and that they were doing everything possible to keep the bank open, and wanted to know if I would give them some help. I told him that I had given them too much help as it was. He told me that they had come to an agreement—that is, the F. D. I. C. and the Banking Department had come to an agreement if they could accomplish certain things, and that if the bank could do some of them the bank could stay open. They told me they had to get together about eighty or ninety thousand dollars in good collateral, and that they had practically all of it pledged, and wanted to know if I wouldn't help them out, and he said 'By giving us some good notes with plenty of collateral on them.' So we discussed what kind of collateral that I had, and I explained that I had a large number of used cars. At that time I had around $20,000.00 worth of used cars, that was unpledged, and I also had my shop equipment, but that was pledged on a note, and they thought that a $2500.00 note was nearer the true value of the equipment. So he asked me if I didn't—if I wouldn't put this note—these notes up, and I told him certainly not. Well, these conversations went back and forth, oh, for possibly three or four days, and during that time he was in my place of business, and I would be in the bank, and it was during this interval that Mr. Webber was there to see me, and when

we got down to the real details of this transaction I was down to the bank, and I was raising some questions— . . .

"The first question I raised was what would be my future borrowing power. In other words, if I would give them this note to use in the bank that would automatically shut my credit off because that would put my loan limit in excess of their limits. Well, he said, 'We will have to talk to Mr. Webber about that.' So we went back in the back end—Mr. Webber was working in the back end—and at that time the three of us was working out a plan whereby my credit would continue as I needed the money, which is referred to here, that is accounted for by these subsequent notes.

"Q. At that time, Mr. Cloonan, what notes did you have under discussion with Mr. Smith and Mr. Webber? What obligations of yours to the bank?

"A. Well, with Smith, the notes that they had. That obligation was the notes that I had practically paid off, and I called Smith's attention to the fact that these notes were paid, that is, that they were almost paid. There was only a very small balance on the three notes, something less than, well something less than twelve or fifteen hundred dollars. Well, he said, later on down the line if Reece had committed fraud in the bank, that I would be able to get the proper credit for these payments that I had made on my notes. . . .

"He told me that if I would give them these notes it would enable them to keep the bank open, and in the event the bank wasn't kept open that these notes were to be returned to me. Now, the notes were undated, and they were only to be used in the event that the bank was to be a going concern. Deb told me that they had had a clearance from the F. D. I. C., and the Banking Department, and that they had given them six months grace in order to keep the bank going. And that was the condition that those notes were delivered, however, they were undated at the time.

"Q. Did you ever give them, or any person, any authority to date those notes and put them in the bank?

"A. No, other than the understanding we had at the time I gave them, the blank notes. . . .

"Mr. Webber was present at the time I gave the note sued on in this case. I wanted a clear understanding regarding the transaction and Smith would get up and go back and talk to Webber . . . and then Webber would come up and talk to Smith during the time Smith and I were discussing the giving of the notes."

He further testified that he was present at the bank on July 29, 1941, when W. J. Steffen, assistant liquidator, gave Mr. Stevenson the following certificate:

"The Exchange State Bank, as of June 30, 1941. Date 6-14-41, 30 days, 7-14-41, $200.00. 6-13-41, 30 days, 7-13-41, $200.00. 6-17-41, 30 days, 7-17-41, $200.00. 6-9-41, 30, 7-9-41, $2500.00, Equipment. 6-9-41, 30, 7-9-41, $8750.00. H. J. and Helen M. 6-9-41, 30, 7-9-41, $550.00, Central Used Car Exchange, by H. J. Cloonan. 6-9-41, 30, 7-9-41, $615.00, Central Used Car Exchange, by H. J. C. Bank account overdraft as of June 30, 1941, $2,317.60. $15,332.60. I hereby

certify that the above seven notes are all the actual liabilities known at this time owing the Exchange State Bank, as of June 30, 1941, plus overdraft of approximately $2,320.00. Then in pencil, the exact amount $2,317.60. W. J. Steffen, Assistant Liquidator."

It will be noted this includes the notes in suit and some small notes given prior to June 30, 1941, and his overdraft on that date. The witness testified that he had paid the Exchange State Bank all that he owed it and that there was a slight credit due him of $100.

On cross-examination counsel for plaintiff asked defendant if he had been charged with a crime in an indictment filed in the United States District Court of Kansas, third division, on May 3, 1942. This case had been tried once before and a new trial granted. Anticipating an inquiry into this matter, as in the previous trial, defendant had objected to the court and counsel for plaintiff before the witness was called to the stand about an inquiry into this matter. He made further objections at the time the witness was cross-examined. The objections were overruled, the defendant answered in the affirmative, and there was read to the jury by counsel for the state several counts of the indictment, and all of it, consisting, we are told, of some 42 pages and as many as eleven counts, was introduced in evidence and later sent to the jury room. Each of the counts read covered about three pages of the printed abstract and contained many charges in formal language. Plaintiff also introduced in evidence the judgment of the Federal District Court, which showed that seven counts of the indictment were dismissed and that the witness, with the permission of the court, had entered a plea of *nolo contendere* to four of the counts of the indictment. On redirect examination the witness was asked if he was guilty of any of the charges in the indictment, to which the court sustained an objection. The court also sustained an objection to questions as to the circumstances under which the plea was entered and the reason for the witness entering such a plea. Upon the hearing of a motion for a new trial the witness included in his affidavit what would have been his answer to those questions had he been permitted to testify. The court did permit the witness to testify that he never suffered any inconvenience or paid any court costs or anything in connection with the criminal case. The witness was asked questions as to the amount of money necessary for him to have in the conduct of his business and whether the circumstances of the criminal indictment and his plea had injured his credit with other banks. Objections to

those questions were sustained. The witness further testified that in August, 1941, he had a conversation with Mr. Dunn and told him he was going to sell the cars covered by the mortgage in suit for the reason that he had already paid the bank all he owed it; that in fact he did sell the mortgaged cars.

William A. Smith, called as a witness for defendant, testified that he was then working in the Joplin National Bank and Trust Company of Joplin, Missouri; that he was previously employed by the Exchange State Bank of Parsons as assistant cashier up until three months before the bank closed, when he was made cashier; that he was familiar with the line of credits the bank extended to H. J. Cloonan; that he remembered that Mr. Cliff Stevenson, certified public accountant, was endeavoring to learn the amount of indebtedness of Mr. Cloonan to the bank. He referred Mr. Stevenson to Mr. Reece, but he did not hear their conversation. Another time when Mr. Stevenson came back the witness checked the liabilities and signed defendant's "Exhibit BB." He testified that this exhibit speaks the truth and was the correct figures on the liability ledger of the bank; that he was handling the books and records and was familiar with them; that the books of the bank were in balance at all times; that he knew Mr. Webber, the examiner of the F. D. I. C.; that Mr. Webber made an examination of the bank; that a board of directors meeting was called and Webber made recommendations to the board, at which time there were other members of the banking department present, and it was recommended that Mr. Reece should resign as president of the bank; that after Reece resigned the witness went in as cashier and was in charge; that Mr. Webber was in the bank and efforts were being made to get the bank's affairs up in the shape they should have been; that they discussed with Mr. Webber and the banking department what would have to be done, or the bank closed. While the bank was kept open and Mr. Webber was there the witness discussed things with him and went to him for advice on different problems. He discussed with Webber the Cloonan notes. The $4,000 note was secured by a mortgage on the office and shop equipment. It was due June 29. There was no security for the $6,900 note, due May 14, and no security for the $950 note, due June 22. After discussing the notes with Webber the witness had several discussions with Cloonan, endeavoring to get him to give security. Cloonan stated that he did not want to change his notes and said the bank owed him some money; that he did not want to

secure the notes until everything was straightened out. He knew
the bank examiners were there, but he wanted to get his affairs
straightened up before he did anything else. He had several con-
versations with Cloonan, two of them at his place of business when
Webber was not there. About the third conversation Cloonan asked
if the bank was to remain open, and the witness told him it was so
far as he knew; that he wanted the notes renewed before the exam-
iners left, and if Cloonan wanted to bring up anything about money
owing him that he could make his claim in the regular course of
business, so far as the notes were concerned. The witness drew up
the notes in suit and told Cloonan that he wouldn't use them until
he found out if the bank was going to stay open, and if the bank
wasn't going to stay open his notes would be in the same condition
as when the examiners were there. At the time these notes in suit
were signed they were undated and the chattel mortgages were un-
dated. The witness told Cloonan these notes would not be dated
until they were to be used, and the notes were not to be used if the
bank was not kept open. He thought he told Mr. Webber about
that, but was not sure; it was his practice to do so when a matter
of this kind was done. He testified that about June 14 he dated the
notes and mortgages June 9 and placed them in the assets of the
bank. He was not sure that he told Webber about that, but thought
he did. He testified that he told Cloonan about it, but that the time
might have been as late as after the bank was taken over by plain-
tiff. He admitted that his doing so was contrary to an agreement
with Cloonan and explained that so many things were to be done
about the bank that perhaps he did not think about his agreement
with Cloonan at that time. On cross-examination he was asked if
it wasn't a common practice in the bank for six months before it was
closed for unrecorded loans to be made. He testified it was not the
practice so far as he knew to handle loans in that way; that he later
learned what the practice was, and answered that he knew there
were items handled there in that way; that he didn't know anything
about the particular items; that he later learned that it was the
practice to carry some cash items in that way.

J. M. Stewart, called as a witness for defendant, testified that he
lived in Parsons and had been in the drug business there for 19
years; that he was a director in the Exchange State Bank; that
he knew Mr. Webber, an employee of the F. D. I. C., and had met
him when he examined the bank in 1940; that Mr. Webber was

present at a meeting of the board of directors on June 1, 1941, and stated: "He was in charge of the meeting"; that what he meant to say was that he was in full charge.

"A. Mr. Webber told the Board of Directors that the bank owed in the neighborhood of eighty to one hundred thousand dollars on unsecured paper, and that our stock was worthless and would be assessed one hundred percent, and asked us to talk to Harold Reece, which was granted. I went outside and found Harold Reece, which he verified what Mr. Webber had told me, and that was all there was to it. And we just lost our stock. We understood the situation, as he explained it very carefully, that we didn't have enough assets to handle eighty or one hundred thousand dollars worth of unsecured paper."

He testified that Mr. Webber told the members of the board that the bank owed more money than its directors could take care of; that the F. D. I. C. was going to have to take over; that the bank was insolvent, and that the F. D. I. C. did take over; that Mr. Webber continued around the bank until the bank was closed; that there were several meetings of the board of directors and the witness was present at all of them and took an active part in them; that he considered the bank was out of the hands of the directors from the time the meeting was called, and that the F. D. I. C. had full charge; that the assets were not transferred until June 21, and that the directors voted to transfer them, but he thought the F. D. I. C. had charge of it long before that. The directors had to sign the papers to make them legal.

R. J. Sharshal, called as a witness for defendant, testified that he was postmaster of Parsons and was a director of the Exchange State Bank; that he first met Mr. Webber, the F. D. I. C. examiner, about June 1, 1941; that Webber called at his office about that time and said there were some conditions about the bank that were not too healthy; that about June 1 a meeting of the board of directors was called; that Mr. Webber and other members of the F. D. I. C. were present at the meeting; that Webber made a talk to the board of directors and stated that the affairs of the bank were in such bad shape that the stock was worthless; that there would have to be a lot of improvement if the bank continued to operate. There were later meetings of the board of directors at which Mr. Webber was always present, and at a later meeting he stated that the bank's condition was worse than he had first reported to them; that the plan they had set up to organize the bank and operate it would not be able to go forward; that it would be unnecessary to liquidate the assets of the bank, but that it might be merged with another bank,

which would take the assets considered good, and that the F. D. I. C. would liquidate the remainder; that the board of directors would have to make arrangements to merge with the other bank. On cross-examination he was asked and answered the following questions:

"Q. Mr. Sharshal, you don't mean to convey the impression to the jury, do you, that Mr. Webber went down there and told you Directors what you had to do, do you? A. Yes.

"Q. He told you what you had to do? A. He told us what to do.

"Q. Did he tell you you had to do it? A. He told us this was the deal.

"Q. What deal? A. Well, that we were to do things. Things we were to do.

"Q. You understood you didn't have to sign anything that you didn't want to sign, didn't you? A. No. I understood that we were to sign it.

"Q. Did somebody coerce you into signing something you didn't want to sign? A. I would say they directed us to do it.

"Q. No, I am asking you if anybody took charge of or closed the bank contrary to the will of the stockholders or the Directors. A. Yes, they did.

"Q. Contrary to the Directors? A. Yes."

Defendant called as a witness A. M. Dunn, who had previously testified for plaintiff, and asked the witness to state the amount, as near as he could, which he, as liquidator, collected from the assets turned over to the F. D. I. C. An objection was made to that and sustained by the court. Defendant offered to show by the witness that as liquidator he had recovered approximately $300,000 from the assets of the bank. An objection to that showing was sustained.

Defendant called Cliff C. Stevenson as a witness, who testified that he had been a certified public accountant since 1934 and belonged to the Kansas Society of Certified Public Accountants and also to the American Institute of Certified Public Accountants; that in 1940 H. C. Cloonan employed his firm to make an audit of his books for 1940 and ascertain all his assets and liabilities. The witness and his assistants were given free rein of all defendant's records, made contacts with all his known creditors, commercial creditors, banks and financial companies, and any other source of information from which they could learn of his liabilities, and they tried to verify his records and the records of the other parties. He called upon the Exchange State Bank several times, asking for a statement of the liabilities of the Cloonan Motor Company held by the bank and any indebtedness the bank held of Mr. Cloonan's. Mr. Smith referred him to Mr. Reece, who put him off several times on account of being busy, but in April, 1941, he told Mr. Reece that he was closing up his work and needed the statement requested; that at that time he was furnished with what became defendant's "Exhibit BB"; that this

statement was in accord with Mr. Cloonan's records. He prepared an audit of the Cloonan Motor Company as a certified public accountant covering the year 1940. This was offered in evidence as "Exhibit HH." Objection was made to the offer and the witness was asked where the records were from which he made the audit and stated that they were still in Mr. Cloonan's place of business. The court sustained an objection to the introduction of the audit because the books themselves from which the audit had been made were not in court. On cross-examination he was asked about some other matters which are not here involved.

In rebuttal John R. Emery was called as a witness for plaintiff and testified that he had lived in Wichita since 1930; that in 1941 he was first special assistant bank commissioner for Kansas; that he first met Mr. Cloonan on June 9, 1941; that his assistant, Mr. Hadsell, and Mr. Webber and Mr. Smith, were present; that he had received word from the banking department that they were dissatisfied with the findings of Mr. Webber's last examination and he had been sent to make further investigation; that the value of unsecured notes in the bank had increased since the last examination and they thought it proper to call the borrowers in for a statement, and Mr. Cloonan was called to the bank. On being asked to state what Mr. Cloonan said regarding his obligations to the Exchange State Bank he answered: "The substance of his statements made at this interview was that he owed his own obligations, consisting of three notes approximately—Now, I can't give the exact figures, approximately $11,500 or $11,800," and that he was responsible for some other obligations not here involved.

W. L. Webber, called as a witness for plaintiff, testified that he had been vice-president of the Security National Bank of Kansas City, Mo., since November 15, 1943; that he was assistant bank commissioner of Kansas in 1937 and 1938; that in 1941 he was examiner for the Federal Deposit Insurance Corporation, which job he had held since January, 1939; that he went to Parsons May 26, 1941, to conduct the annual examination of the Exchange State Bank; that he gave a report of the examination to the F. D. I. C. district office at Kansas City and returned to Kansas City on June 2; that he had a conversation with Reece in which Reece offered to resign because of apparent discrepancies and irregularities. The witness told him he had no authority to accept his resignation; that he should present it to the officers of the bank; that his authority

was to determine the asset condition of the bank, appraise the value of its loans, bonds, and other assets, to determine its solvency, and to report to the state banking department any unsound banking practices; that he had no authority to take charge of the bank and did not take charge of it; that he came back to Parsons on June 9 and was present at the conversation with John R. Emery, Guy Hadsell and Mr. Cloonan, in which Mr. Cloonan said that he owed the bank $11,850, and that he also owed the bank $11,500 on a note signed by his wife. He further stated that he did not know anything about any conditional delivery agreement between Cloonan and Smith at the time the notes sued upon were made. On cross-examination he testified that the F. D. I. C. is an insurance corporation, charges one-twelfth of one percent for insurance of deposits in banks for each individual up to $5,000; that the assets of the bank were turned over to the examiner Miller of the F. D. I. C. and that Mr. Dunn finally took over the liquidation of the bank; that he did not preside at the meeting of the board of directors on June 1; that Mr. Stewart and Mr. Sharshal were mistaken when they testified he did; that he did not state at the meeting that the bank was insolvent and could go no further; that when he returned to the bank on June 9 he put in his entire time at the bank during working hours; that on June 9 he had a conversation with Cloonan and called his attention to a check for $3,207 that had been charged to his account and asked to see the check, which apparently was shown to him, and by an examination of the checking account the witness found the check had been charged to his account but that he had received no credit on his liability ledger; that while the witness was at the bank he consulted with Mr. Smith about various transactions in connection with the bank. Smith asked his advice about renewing some loans and obtaining securities. He discussed the three Cloonan notes—the $6,900 note, the $4,000, and the $950 note—with Smith. He saw those notes in the bank. These were the only three that were assets of the bank. The witness did not recall that he had ever seen the $2,500 and the $9,350 notes involved in suit.

Plaintiff called as a witness Surrie W. Fenlaw. He testified he was 39 years of age, had been employed by plaintiff since May, 1942; that his home was Gilmer, Texas; that in 1930 he obtained a B. A., and an M. A. degree in accounting, in the University of Texas; that he was not a certified public accountant; that he made an audit of Mr. Cloonan's books, which took him from January 28 to June 2,

1944; that three days prior to his testifying he had prepared a statement, which was offered in evidence as plaintiff's "Exhibit 18," a copy of which appears to have been given to defendants' attorney at the time it was offered in evidence. This pertained to the three checks—May 10, 1941, $2,500; May 16, 1941, $4,000; and May 17, 1941, $3,207; which defendant had alleged he had given the Exchange State Bank and for which he had received no credit, and purported to show notes to the bank for which these checks were payments, and the witness' own interpretation with respect to those matters. This was admitted in evidence over defendants' objection, and later was sent with the jury at its consultation.

In surrebuttal defendant recalled Cliff C. Stevenson, who had but a few minutes to look over "Exhibit 18," who testified there was no way an auditor or bookkeeper, who had not had the opportunity to make up the books himself and handle the transaction, could tell from the record on what note the $4,000 check was paid, and that was true of the other checks, the notation being simply that the checks were on "notes payable"; that it would be entirely an assumption of an auditor to say that the checks were payable upon any particular notes.

Defendants requested a number of instructions which were not given, and objected because of the refusal of the court to give them, and also objected to instructions given which were not in harmony with those requested.

The jury was asked and answered special questions as follows:

"1. Do you find that the notes and mortgages sued upon were to be used and placed in the assets of the bank only in the event the bank was kept open as a going concern? A. No.

"2. Were the notes and mortgages sued upon undated at the time they were left with the bank? A. Yes.

"3. Were these notes and mortgages placed in the bank contrary to agreement with Cloonan at the time they were left with the bank? A. No.

"4. Do you find that Cloonan requested the payments he made to be applied on old notes and obligations, and not on the notes sued upon? A. No. . . .

"11. If you find for the plaintiff in case No. 5439, please state the amount you allow by way of principal, and by way of interest, as follows:

"Principal: $5,468.18
"Interest: $1,874.73
"Total: $7,342.91."

Defendants moved to set aside the answers to questions Nos. 1, 3, 4 and 11 upon the grounds that they were contrary to the evidence and not supported by the evidence. Defendants moved for

a new trial, which raised all the questions hereinafter discussed, and in support of the motion filed an affidavit of H. J. Cloonan which embodied the evidence alleged to have been wrongfully excluded.

We now turn to the legal questions argued. Appellants first contend the court erred in admitting in evidence the indictment in the federal criminal action, defendant's plea of *nolo contendere* therein, and in permitting counsel for plaintiff to read several counts of the indictment to the jury, and in sending the entire indictment to the jury for its use while considering its verdict. The point is well taken. In 22 C. J. S. 658, it is said:

"The so-called plea of 'nolo contendere,' which is still allowed in some jurisdictions, is not a plea in the strict sense of that term in the criminal law, but a formal declaration by accused that he will not contend with the prosecuting authority under the charge. It is said to be in some respects in the nature of a compromise between the state and accused. It is not one of the pleas open to accused as a matter of right, but is allowable only under leave of, and acceptance by, the court. When accepted by the court, it becomes an implied confession of guilt, and, for the purposes of the case only, equivalent to a plea of guilty; and, when judgment has been entered on the plea, the record is competent evidence of the fact of conviction. The difference between it and a plea of guilty appears simply to be that, while the latter is a confession binding accused in other proceedings, the former has no effect beyond the particular case. It is an implied confession of guilt only, and cannot be used against accused as an admission in any civil suit for the same act." (Citing many authorities.)

We call attention to the fact that in some respects it is in the nature of a compromise between the state and the accused. In *State v. La Rose,* 71 N. H. 435, 52 A. 943, the court said:

"The plea is in the nature of a compromise between the state and defendant —a matter not of right, but of favor. Various reasons may exist why a defendant conscious of innocence may be willing to forego his right to make defence if he can be permitted to do so without acknowledging his guilt." (p. 438.)

And in *Doughty v. Amoreel,* 22 R. I. 158, 46 A. 838, the court used this language:

"This is not a confession of guilt, because an accused person might find himself without witnesses to establish his innocence, from their death, absence, or other cause, . . ." (p. 159.)

We call attention, also, to the language above quoted from C. J. S., that it is "an implied confession of guilt only, and cannot be used against accused as an admission in any civil suit for the same act."

In *Tucker v. United States,* 196 Fed. 260, it was held that it is distinguishable from a plea of guilty in that it cannot be used against the defendant as an admission in any civil suit for the same act. Many authorities are cited in support of the text on this point. Substantially the same text is found in 16 C. J. 401, where authorities are cited upon this point under Note 88.

Cannot be used in a civil case:

*Com., ex rel. Warner, Appellant, v. Warner,* 156 Pa. Super. 465, 40 A. 2d 886; *Twin Ports Oil Co. v. Pure Oil Co.,* 26 F. Supp. 366.

Technically, a plea of *nolo contendere* does not admit the allegations of the charge, but merely says that defendant does not choose to defend: *United States v. Weirton Steel Co.,* 62 F. Supp. 961; *Esarey v. Buhner Fertilizer Co.* (Ind. App.), 69 N. E. 2d 755, 757; *Commonwealth v. Smith, Appellant, et al.,* 151 Pa. Super. 113, 30 A. 2d 339, 346; *Teslovich et ux., v. Fire F. Ins. Co., Appel.,* 110 Pa. Super. 245, 168 A. 354; *Schad v. McNinch,* 103 W. Va. 44, 136 S. E. 865; *In re Smith,* 365 Ill. 11, 5 N. E. 2d 277; *State v. Suick,* 195 Wis. 175, 217 N. W. 743; *Olszewski v. Goldberg,* 223 Mass. 27, 111 N. E. 404; *Fidelity-Phenix Fire Ins. Co. of New York v. Murphy,* 231 Ala. 680, 166 So. 604, 609; *State v. La Rose,* 71 N. H. 435, 52 A. 943; *Commonwealth v. Ingersoll,* 145 Mass. 381, 14 N. E. 449.

The whole matter here is susceptible of the view that after the district attorney's office had been induced to get the indictment returned by a grand jury it did not want to try the case against Cloonan. Certainly, if the government had wanted to try the case it would have done so. It may be that the defendant regarded himself as innocent and was planning to defend the case if the government decided to try it. In his affidavit on the motion for a new trial were included statements to that effect, and that he so advised the district attorney. The result was that seven counts of the indictment were dismissed when the government was willing for him to enter a plea of *nolo contendere,* with the understanding he would receive no punishment. This matter had to be taken up and approved by the presiding judge of the district court, which at that time was the Hon. Richard J. Hopkins. There is no contention that was not done, and defendant in his affidavit on his motion for a new trial states that it was, with the result that he was given no punishment by the way of fine or imprisonment, and that he was not even charged with any of the costs of the proceeding. It might be regarded as tantamount to an admission by the

government that the charges of the information could not be proved. That it pertained to the same matter involved in the civil action cannot be disputed. Indeed, that is why plaintiff was so anxious to have it introduced. Hence, its introduction was in direct conflict with the rules stated in C. J. S., *supra,* sustained by many authorities, and with none cited to the contrary. It was argued by appellee that this whole matter was introduced simply as affecting the credibility of the witness, H. J. Cloonan. The court instructed the jury that it was introduced for that purpose and should not be considered otherwise. We find nothing in the record as abstracted that the jury were advised of that fact at the time the evidence was introduced. Aside from that, we think its introduction for that purpose was not justified and amounted to an abuse of the court's discretion. Three or four of the counts were read in full to the jury. (Counsel disagree as to how many were read.) Each of these covered about three pages of the printed abstract. They are filled with accusatory words and phrases common and proper in such an indictment. More than that, the entire indictment was received in evidence, which contained eleven counts of about 42 pages, and all of it was sent to the jury room. Counsel for plaintiff in his closing argument made extensive use of it in condemning the defendants. The passionate discussion of that matter by counsel could not help but inflame the jury, and was highly improper. Counsel for appellee says that defendant's counsel did not object to the argument. The objection was not necessary, since the court had erroneously admitted the evidence. Counsel for plaintiff properly assumed that he had a right to discuss it. (See *State v. Powell,* 120 Kan. 772, 798 to 800, 245 Pac. 128.) It was error for the court, (a) to receive in evidence the *nolo contendere* plea, (b) to permit to be read to the jury three or four counts of the indictment, (c) to send the entire indictment to the jury and to permit plaintiff's argument thereon to the jury.

Counsel for appellants contend the court erred in admitting in evidence plaintiff's "Exhibit 18." The point is well taken. It was not alone the report of an accountant whose business it was to state in his report what he actually found, but it went further and gave the witness's individual conclusion or assumption pertaining to those matters. It presented a theory decidedly at variance with any claim of the plaintiff in its pleadings and to any evidence previously offered in the lengthy trial. Plaintiff had alleged in its

reply that it "does not know what said checks were in payment for or whether said bank ever received said payments or the benefit thereof." Its contention throughout was that there were some things handled by Reece which did not show upon the books of the bank, and that these payments might have been made upon something of that kind. Plaintiff's evidence on that point was negligible and unsubstantial. In his "Exhibit 18" the witness put his finger directly upon what he thought might have been the notes upon which these checks were paid. In doing so he necessarily assumed matters not shown by the records he examined. He had completed his audit of Cloonan's books June 2, 1944, but "Exhibit 18" had been compiled only three days before the witness testified and apparently was not even shown to counsel for defendants until it was offered in evidence. It was a late substituted defense for the one pleaded in plaintiff's reply. It was error for the court, (a) to admit in evidence plaintiff's "Exhibit 18," and (b) to send it to the jury.

Recalling the bank's liquidator, Mr. Dunn, defendants attempted to have the witness disclose what plaintiff had received in the liquidation of the affairs of the bank. The court denied defendants' right to make the inquiry. This ruling would have been proper if plaintiff had not, both in its petition and its evidence, stressed the fact that it had paid the Parsons State Bank a large sum to justify the Parsons State Bank in assuming the liabilities of the Exchange State Bank to its depositors. This left the impression that the plaintiff had been seriously damaged financially by the closing of the Exchange State Bank. The evidence sought to be brought out, if as contended by defendants, might have tended to weaken any sympathy for plaintiff because of its large payment to the Parsons State Bank. We think the true rule is that neither of these amounts had any place in this lawsuit. The specific terms of the contract made by plaintiff with the Parsons State Bank are not shown by this record, but it was alleged that plaintiff made the contract in pursuance of its authority, authorized by 12 USCA, § 264 (n) (4). The pertinent part of this section reads:

"Whenever in the judgment of the board of directors such action will reduce the risk or avert a threatened loss to the Corporation and will facilitate a merger or consolidation of an insured bank with another insured bank, or will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank, the Corporation may, upon such terms and conditions as it may determine, make loans secured in whole

or in part by assets of an open or closed insured bank, which loans may be in subordination to the rights of depositors and other creditors, or the Corporation may purchase any such assets or may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing the assets of an open or closed insured bank. Any insured national bank or District bank, or, with the approval of the Comptroller of the Currency, any receiver thereof, is authorized to contract for such sales or loans and to pledge any assets of the bank to secure such loans."

Acting under this authority plaintiff's directors were authorized to make a contract with another insured bank by which it would take over eligible assets of the failed bank and guarantee the deposit liabilities and pay to the bank a sum, being the difference between the eligible assets and the deposit liabilities. Apparently this is what was done. However, there are only two parties to such a contract—the F. D. I. C. on the one hand and the insured bank with which it contracted on the other. The defendants were not parties to that contract and their rights and liabilities were neither increased nor diminished by its terms.

(See *Thomas P. Nichols & Son v. National City Bk.*, 313 Mass. 421, 48 N. E. 2d 49; certiorari denied, 320 U. S. 742; 88 L. Ed. 440; 64 S. Ct. 42; *Lambertson v. Federal Deposit Ins. Corporation*, 141 F. 2d 95; *Brown v. New York Life Ins. Co.*, 152 F. 2d 246.)

The principal issues of fact to be tried in this case are relatively simple:

*First.* Were the notes and chattel mortgages sued upon by plaintiff, blank as to dates when executed by defendant, delivered to William A. Smith, cashier of the Exchange State Bank, with the understanding that they were not to be dated and placed among the assets of the bank unless the bank was kept open as a going concern? Only two witnesses testified on that point—H. J. Cloonan and William A. Smith, cashier. Both testified the instruments were so conditionally executed and delivered. No one testified to the contrary. Smith thought he told Webber about it, but he appeared not to be certain that he did so. Webber denied any knowledge of the matter. No other witness pretended to know anything about it. Plaintiff's evidence as to when the notes and mortgages sued upon became a part of the assets of the Exchange State Bank is not very specific. Emery testified that on June 9 Cloonan stated that he owed on his own obligations, consisting of three notes, approximately $11,500 or $11,800. Referring to the same interview Webber remembered the sums stated by Cloonan as being $11,800. Webber, an examiner

for the plaintiff in the State Banking Department, was working at the Exchange State Bank from May 26 to June 2, when he went to Kansas City, but returned June 9 and continued his work in the bank until it was closed June 21. He testified that he saw the Cloonan notes for $6,900, $4,000 and $950 in the bank and that "these were the only three that were assets of the bank." He never did see the notes and chattel mortgages sued upon in these cases. He testified the assets of the bank were transferred to Miller, plaintiff's examiner. Miller did not testify. Mr. Dunn, who was appointed liquidator of the Exchange State Bank, began his duties on June 29, testified that he found the notes and mortgages sued upon among the assets of the bank; that he also found the three Cloonan notes for $6,900, $4,000 and $950, aggregating $11,850, but that these were not among the assets of the bank. Who arranged that setup and when it was done is not disclosed by any evidence.

*Second.* Was defendant, H. J. Cloonan, entitled to credit upon his notes for the three checks dated May 16, May 17 and May 24, 1941, as alleged in his answer? These checks were made payable to the bank, signed by H. J. Cloonan, and charged to his account. This appears to be conceded. We previously have discussed the pleadings and evidence respecting that issue.

Plaintiff was a compensated insurer of certain deposit liabilities of the Exchange State Bank. The consideration which passed between them was the semiannual premiums paid by that bank to plaintiff for such insurance. When the bank failed, plaintiff, as it was authorized to do under the law, made a contract with the Parsons State Bank to assume the deposit liabilities of the failed bank insured by plaintiff. The consideration the plaintiff paid the Parsons State Bank was made to carry out its contract with that bank. Plaintiff paid no separate consideration for the notes sued upon in these actions. When plaintiff took over the assets of the Exchange State Bank it became a holder thereof with the same right to enforce obligations due the bank as the bank would have had if it had not failed. It seems clear to us that the plaintiff did not become a holder "in due course" of the notes sued upon, as alleged by plaintiff, and that the court's instruction thereon, particularly 26B, was erroneous. Appellants complain of the refusal of the court to give instructions requested and of several of the instructions that were given. It would unduly prolong this opinion to analyze those in detail. Since it is clear the judgment appealed from must be re-

versed we think we have said enough already so that proper instructions will be given on the new trial. For the same reason we do not deem it necessary to deal specifically with appellants' motion to set aside the answers to some of the special questions, or to discuss some other minor matters argued.

The judgment of the court below is reversed with directions to grant a new trial upon the issues made by the pleadings.